Nos. 23-2309 and 23-2467

_____

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

BAD RIVER BAND OF THE LAKE SUPERIOR
TRIBE OF CHIPPEWA INDIANS OF THE BAD
RIVER RESERVATION,
  Plaintiff-Appellee, Cross-Appellant,

v.

ENBRIDGE ENERGY COMPANY, INC. and
ENBRIDGE ENERGY, L.P.,
  Defendants-Appellants, Cross-Appellees.


ENBRIDGE ENERGY COMPANY, INC. and
ENBRIDGE ENERGY, L.P.,
  Counter-Plaintiffs, Appellants/Cross-
Appellees,

v.

BAD RIVER BAND OF THE LAKE SUPERIOR
TRIBE OF CHIPPEWA INDIANS OF THE BAD
RIVER RESERVATION,
  Counter-Defendants, Appellees/Cross-
Appellants.

Appeals from the United States
District Court for the Western
District of Wisconsin.

No. 3:19-cv-00602-wmc

William M. Conley,
  *Judge.*

**Brief of *Amici Curiae* Michigan Propane Gas Association, National Propane Gas Association, and Wisconsin Propane Gas Association in Support of Defendants-Appellants/Cross-Appellees' Brief and Reversal of Part of the District Court's Judgment**

Gaëtan Gerville-Réache (P84538)
Ashley L. Yuill (P84429)
Warner Norcross + Judd LLP
150 Ottawa Avenue NW, Ste. 1500
Grand Rapids, MI 49503
Telephone: (616) 752-2000
greache@wnj.com; ayuill@wnj.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>23-2309 and 23-2467</u>

Short Caption: <u>Bad River Band of the Lake Superior Tribe of Chippewa Indians v Enbridge Energy company, Inc., et al,</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

       [ ]      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

        <u>Michigan Propane Gas Association, National Propane Gas Association, and Wisconsin Propane Gas Association</u>

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

        <u>Warner Norcross + Judd LLP</u>

(3)      If the party, amicus or intervenor is a corporation:

        i)      Identify all its parent corporations, if any; and

        ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: <u>/s/  Gaëtan Gerville-Réache</u>      Date: <u>09/18/2023</u>

Attorney's Printed Name: <u>Gaëtan Gerville-Réache</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** [✔]   **No** [ ]

Address: <u>150 Ottawa Avenue NW, Suite 1500</u>

      <u>Grand Rapids, MI 49503</u>

Phone Number: <u>(616) 752-2000</u>      Fax Number: <u>(616) 752-2500</u>

E-Mail Address: <u>greache@wnj.com</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>23-2309 and 23-2467</u>

Short Caption: <u>Bad River Band of the Lake Superior Tribe of Chippewa Indians v Enbridge Energy company, Inc., et al,</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Michigan Propane Gas Association, National Propane Gas Association, and Wisconsin Propane Gas Association</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Warner Norcross + Judd LLP</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: <u>/s/  Ashley L. Yuill</u>    Date: <u>09/18/2023</u>

Attorney's Printed Name: <u>Ashley L. Yuill</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes ☐  No ☐

Address: <u>150 Ottawa Avenue NW, Suite 1500</u>

<u>Grand Rapids, MI 49503</u>

Phone Number: <u>(616) 752-2000</u>    Fax Number: <u>(616) 752-2500</u>

E-Mail Address: <u>ayuill@wnj.com</u>

rev. 12/19 AK

# TABLE OF CONTENTS

Page

APPEARANCE AND DISCLOSURE STATEMENTS ................................................. ii

TABLE OF AUTHORITIES ......................................................................... v

STATEMENT OF *AMICI CURIAE* ............................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................... 3

BACKGROUND ...................................................................................... 5

ARGUMENT ......................................................................................... 10

    I.    The permanent injunction must be reversed because it violates the Transit Treaty ................................................................ 10

        A.    The district court is a "public authority" under the Transit Treaty and lacks authority to take measures that interrupt transmission of hydrocarbons through Line 5 ........... 10

        B.    The Band is a "public authority" and equally bound by the Treaty's principle of uninterrupted transmission; it cannot be granted relief in violation of the Transit Treaty ....... 13

    II.    The district court failed to apply the proper injunctive standard and to hold the Band to its burden of proving that the public interest would not be disserved ............................................. 14

    III.    Given the serious consequences to the public of shutting down Line 5, the district court's imposition of a three-year shutdown timeline is an abuse of discretion ......................................... 18

CONCLUSION AND REQUESTED RELIEF ......................................... 22

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Air France v. Saks*,
    470 U.S. 392 (1985) .................................................................................. 11

*Asakura v. City of Seattle*,
    265 U.S. 332 (1924) .................................................................................. 11

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) .................................................................................. 16

*Federal Trade Commission v. Credit Bureau Center, LLC*,
    937 F.3d 764 (7th Cir. 2019) ...................................................................... 5

*Guardian Pipeline, L.L.C. v. 295.49 Acres of Land*,
    No. 08-C-0028, 2008 WL 1751358 (E.D. Wis. Apr. 11, 2008) .......... 17, 19

*Hedges v. Dixon County*,
    150 U.S. 182 (1893) .................................................................................. 13

*Kansas v. Nebraska*,
    574 U.S. 445 (2015) .................................................................................. 17

*LAJIM, LLC v. General Electric Co.*,
    917 F.3d 933 (7th Cir. 2019) .............................................................. 15, 17

*Liebhart v. SPX Corp.*,
    998 F.3d 772 (7th Cir. 2021) .............................................................. 14, 15

*Medellin v. Texas*,
    552 U.S. 491 (2008) .................................................................................. 10

*Oliphant v. Suquamish Indian Tribe*,
    435 U.S. 191 (1978) .................................................................................. 13

*Rees v. City of Watertown*,
    86 U.S. 107 (1873) .................................................................................... 13

*Stern v. Marshall*,
    564 U.S. 462 (2011) .................................................................................. 11

*Tennessee Valley Authority (TVA) v. Hill*,
    437 U.S. 153 (1978) .............................................................................. 12, 17

*Texas Eastern Transmission Corp. v. Giannaris*,
  818 F. Supp. 755 (M.D. Pa. 1993) ................................................ 18

*Ty, Inc. v. Jones Group, Inc.*,
  237 F.3d 891 (7th Cir. 2001) ..................................................... 18

*United States v. Rogers*,
  45 U.S. 567 (1846) .................................................................. 13

*United States v. Santos*,
  553 U.S. 507 (2008) ................................................................ 11

*Volkswagenwerk Aktiengesellschaft v. Schlunk*,
  486 U.S. 694 (1988) ................................................................ 11

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ................................................................ 12

*Williams Pipe Line Co. v. City of Mounds View, Minnesota*,
  651 F. Supp. 551 (D. Minn. 1987) ............................................. 17

## Statutes

8 U.S.C. § 1329 ......................................................................... 11

23 U.S.C. § 101 ........................................................................ 13

## Treatises

*Agreement Between the Government of the United States and the
  Government of Canada Concerning Transit Pipelines*,
  Jan 28, 1977, 28 U.S.T. 7449 ........................................ 4, 11, 12, 14

## Rules

Federal Rule of Appellate Procedure 29 ......................................... 1

## Other Authorities

U.S. Constitution, Article VI ...................................................... 11

**STATEMENT OF *AMICI CURIAE***

The Michigan Propane Gas Association, National Propane Gas Association, and Wisconsin Propane Gas Association submit this brief *Amici Curiae*—authorized by the consent all parties—in support of Defendants-Appellants/Cross-Appellees Enbridge Energy Company, Inc. and Enbridge Energy, L.P.[1]

The Michigan Propane Gas Association ("MPGA") is a trade and membership service organization that represents all facets of the propane industry in the State of Michigan, including before municipal and State government, as well as the Federal Government.  MPGA's mission is to promote the proper handling and use of propane, to work for a favorable environment for propane distribution and marketing, and to increase its application by demonstrating propane's value as a clean energy source.[2]  Currently, MPGA has 205 members, with 97 of those members providing retail propane service to Michigan homes and businesses.

The National Propane Gas Association ("NPGA") is the national trade association representing the U.S. propane industry.  Approximately 2,400 companies are currently members of NPGA, including 36 affiliated state and regional associations.  NPGA's members are primarily retail marketers of propane

---

[1] Pursuant to Federal Rule of Appellate Procedure 29, undersigned counsel for *Amici Curiae* certify that: no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person or entity, other than the *Amici Curiae*, their members, or their counsel, contributed money intended to fund the preparation or submission of this brief.

[2] *See* https://mipga.org.

1

gas who deliver the fuel to the end user, but other members of NPGA include propane producers, transporters, and wholesalers; manufacturers and distributors of associated equipment, containers, appliances, and trucks; fabricators of propane gas cylinders and tanks; and service providers of all types.[3]

The Wisconsin Propane Gas Association ("WPGA") is a trade and membership service organization providing services that communicate with propane marketers, suppliers, builders, and consumers throughout the state of Wisconsin. WPGA's primary purpose is to promote awareness and the growth of propane usage as a safe and reliable source of energy.[4]  WPGA currently has 227 members, with 156 of those members providing retail service to Wisconsin homes and businesses.

MPGA, NPGA, and WPGA (collectively, the "Propane Associations") serve an important sector of the public directly impacted by the trial court's decision—individuals and businesses that are primary users of propane carried through Line 5.  As discussed in more detail below, the injunctive relief entered by the district court will have severe consequences for households, businesses, and industry in Michigan, Wisconsin, and the broader region.  By virtue of their role in the market, the Propane Associations' members have a significant interest in the continued flow of propane carried through Line 5, which is jeopardized by the district court's permanent injunction order.  The Propane Associations respectfully

---

[3] *See* https://npga.org.

[4] *See* https://wipga.org.

2

submit this brief to emphasize the critical role the Line 5 pipeline plays in ensuring the safe and reliable distribution of propane, and to address the impacts that the shutdown sought by the Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation (the "Band") would have on those members of the public—individuals and businesses alike—who depend upon propane.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The permanent injunction under review in this appeal presents an existential threat to the energy supply relied upon by hundreds of thousands of households and businesses across six states and the second-largest province in Canada. Line 5 transmits crude oil and 80,000 barrels of natural gas liquids ("NGL") per day across the Midwest. It transports these hydrocarbons to various fractionators along the way, which extract propane from the NGL stream and supply it to households and businesses in the Midwestern states and Ontario. This continuous supply of energy resources is of such critical importance to the energy needs of the United States and its northern ally, Canada, that the President signed and the Senate confirmed an international treaty agreeing that neither country would institute any measures that would impede or interfere with the transmission of hydrocarbons through Line 5. The district court's permanent injunction order, which requires the decommission of Line 5 within three years despite the inevitable shutdown that will result, cannot stand in the face of this treaty or the tremendous harm to the public.

First, having found that its injunction would most likely interrupt the flow of hydrocarbons through Line 5, the district court lacked the legal or equitable

3

authority to enter such an order.  Under the 1977 Agreement between the Government of Canada and the Government of the United States Of America Concerning Transit Pipelines, 28 U.S.T. 7449 (the "Transit Treaty"), federal courts lack the power to grant relief that will interfere with the flow through Line 5.  The district court's order was not a valid exercise of its equitable authority and must be reversed.

Second, even if the district court could have exercised such discretion, it applied the wrong standard.  To be entitled to such relief, the Band had to demonstrate that the injunction would not disserve the public interest.  The court instead mandated the shutdown of Line 5 on a timeline that, in the court's own words, only "mitigated somewhat" the consequences to the public of eliminating this major energy source for homes and businesses in one of the United State's coldest climates.  Without even weighing the severity of those consequences, the district court mysteriously concluded that preventing propane shortages and price hikes for thousands of homes and businesses across the Midwest and Ontario somehow could never justify leaving Line 5 operational on the Band's land for even two more years beyond the initial three years of delay in the court's order.  But there is no basis in law for this ruling or for relieving the Band of the burden to demonstrate that the injunction will not disserve the public interest.

Finally, given the weighty public interests involved, there is no reasonable outcome based on this record where use of Line 5 is enjoined prior to completion of a reroute.  "Courts of equity may, and frequently do, go much farther both to give and

4

withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 784 (7th Cir. 2019) (quoting *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937)).  Assuming the lower court had equitable authority to interrupt the flow of hydrocarbons through Line 5, there is still no room in equity for an injunction that only "mitigates somewhat" the grave consequence to the public of the likely propane shortages and undisputed cost increases that would result from shutting down Line 5.  Equity demanded that the court withhold such relief when it would create a significant risk of serious harm to the hundreds of thousands of people and businesses.  One cannot reasonably conclude on this record that the district court's injunctive order avoids such risk, and the district court never concluded it that it did.  The district court abused its discretion in putting the public at such great risk merely to save the Band a few additional years of "legal" harm from the alleged trespass on twelve parcels of its property.

The Propane Associations accordingly urge this Court to reverse the district court's permanent injunction order.

## BACKGROUND

The pipeline at issue belongs to a larger network of Enbridge pipelines that begins in Western Canada.[5]  Part of Enbridge's Lakehead System, Line 5 transports

---

[5] 10/28/2022 (Afternoon) Trial Tr. 58-59, Doc. No. 610

hydrocarbons 645 miles, flowing west-to-east from Superior, Wisconsin to Sarnia, Ontario[6]:



Line 5 delivers 65% of the propane that heats homes in Michigan's Upper Peninsula and supplies 55% of Michigan's overall propane needs.[7]  In 2021, Michigan consumers used approximately 522 million gallons of propane, making Michigan the second largest propane-using state in the United States.[8]  Michigan citizens are the largest consumers of residential propane in the United States year after year.  A 2019 analysis of the Michigan energy infrastructure and operations by

---

[6] *Id*. at 58; 6/16/2023 Op. & Order 24, Doc. No. 684, A96.

[7] 10/28/2022 (Morning) Trial Tr. 41-42, Doc. No. 603.

[8] Br. of *Amici Curiae* Propane Ass'ns 3 n.4, Doc. No. 657 (citing Propane Education & Research Council, *Annual Retail Propane Sales Report* (2021)).

the Michigan Public Service Commission indicates that more than 320,000 primary residences rely upon propane for space heating, water heating, cooking, and other applications, including more than 20,000 households in Michigan's Upper Peninsula.[9]  Wisconsin citizens are also large consumers of residential propane.  In fact, in 2021, only Michigan used more propane for residential heat than Wisconsin, and more than 260,000 primary residences in Wisconsin rely upon propane for space heating, water heating, cooking, and other applications.[10]

Line 5 transports approximately 80,000 barrels a day of natural gas liquids.[11] The major portion of the natural gas liquid stream is composed of propane.[12]  Line 5 is connected to several fractionators, which remove propane from a stream of natural gas liquids and return the remaining natural gas liquids to the pipeline.[13] The first such fractionator is located in Superior, Wisconsin, and has the capacity to produce 420,000 gallons of propane per day.[14]  The stream reaches another fractionator in Rapid River, Michigan.  That facility is estimated to produce

---

[9] *Id.* at 3 n.5 (citing Mich. Pub. Serv. Comm'n, *Michigan Statewide Energy Assessment* (Sept. 11, 2019), at pp. 121, 131–132, https://tinyurl.com/2p9yzf9k [hereinafter, "MPSC Report"].).

[10] *Id.* at 4 n.6 (citing MPSC Report, at p. 132).

[11] 6/16/2023 Op. & Order 25, Doc. No. 684, A97.

[12] Expert Report of Neil K. Earnest [hereinafter, "Earnest Report"] 15, Doc. No. 262.

[13] *Id.*

[14] Br. of *Amici Curiae* Propane Ass'ns 4 n.13, Doc. No. 657 (citing Plains Midstream Canada, *Michigan and Plains – Propane Overview* (Sept. 2019), at p. 4, https://tinyurl.com/3jrr9t9y [hereinafter, "Plains Propane Overview"]).

approximately 84,000 gallons of propane per day (with the capacity to produce 315,000 gallons per day), with annual production of 30.6 million gallons.[15]  The propane removed in the Rapid River facility is then distributed to heat homes and power industry in both Wisconsin and Michigan.[16]

After Rapid River, the natural gas liquid stream continues to Sarnia, Ontario, where fractionators again remove propane.  The Sarnia facility has the capacity to produce 4.4 million gallons of propane per day.[17]  A significant portion of the propane removed in Sarnia returns to Michigan's Lower Peninsula and some reaches markets as far away as Indiana, Ohio, New York, and Virginia.[18]  Propane from Sarnia also supplies virtually all of the propane consumed in Ontario.[19]

The Sarnia fractionator is responsible for providing approximately 56% of the propane supply to Michigan's Lower Peninsula, and the Rapid River facility is responsible for providing most of the propane supply for Michigan's Upper Peninsula.[20]  The Superior fractionator is also responsible for supplying approximately 7% of the propane in Wisconsin and Minnesota, and a much higher percentage of the supply to northern Wisconsin and Minnesota.[21]  Shutting down

---

[15] *Id.* at 4 n.8 (citing MPSC Report, at p. 129).

[16] *See id.*

[17] *Id.*; *see also id.* at 4 n.10 (citing Plains Propane Overview, at p. 4).

[18] Earnest Report 19, Doc. No. 262.

[19] *Id.* at 18-19.

[20] *Id.* at 17–18, 19.

[21] *Id.* at 16.

Line 5 would result in the closure of the fractionators in Superior and Rapid River, and the operations in Sarnia would be substantially curtailed.[22]  Thus, Line 5 is essential to providing propane to meet the needs of citizens in Michigan and the broader Midwest region of the United States, in addition to Ontario.

In requiring Enbridge to remove Line 5 from the Band's tribal territory within three years, the district court acknowledged that its order would interrupt the transmission of hydrocarbons through Line 5.  It even recognized that the five-year timeline "absent extraordinary efforts by Enbridge and intervention by federal officials . . . appears to be optimistic given the organized opposition to it, including by the Band."[23]  Given that the reroute would not be completed under the district court's timeline, it moved on to consider whether there would be "significant market disruptions," finding there would be "fewer" than if Line 5 were shut down immediately.[24]  Thus, the court was fully aware that its decision would shut down Line 5, since there obviously would be no significant market disruptions otherwise.

---

[22] *Id.* at 15–18, 22.

[23] 6/16/2023 Op. & Order 51, Doc. No. 684, A123.

[24] *Id.* at 35-36.

9

## ARGUMENT

**I.     The permanent injunction must be reversed because it violates the Transit Treaty.**

The district court's order to decommission Line 5 within three years even if the reroute is not yet complete must be reversed because the district court lacked the authority to enter such an order.  The district court itself found that the injunction's three-year timeline will inevitably result in the interruption of the flow of hydrocarbons through Line 5.  6/16/2023 Op. & Order 35-36, Doc. No. 684, A107-08.  But the district court is prohibited from taking any action that would interfere with the flow of Line 5 under the Transit Treaty for two reasons.  First, the district court is a "public authority" and therefore prohibited under the Transit Treaty from taking any action—which includes the granting of injunctive relief—that would interrupt the transmission of hydrocarbons through Line 5.  Second, the Band is also a public authority in the territory of the United States and bound by the same principle of uninterrupted transmission.  To grant the Band its requested injunctive relief would be to grant relief that violates federal law, which federal courts cannot do.

**A.     The district court is a "public authority" under the Transit Treaty and lacks authority to take measures that interrupt transmission of hydrocarbons through Line 5.**

The interpretation of a treaty, like the interpretation of a statute, begins with its text.  *Medellin v. Texas*, 552 U.S. 491, 506 (2008).  Under the well-established rules of statutory interpretation, when a treaty's term is undefined, courts give it its ordinary meaning and consider the context in which the term is used.

10

*Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 699-700 (1988); *United States v. Santos*, 553 U.S. 507, 511 (2008). A treaty's terms must also be interpreted in a manner "consistent with the shared expectations of the contracting parties." *Air France v. Saks*, 470 U.S. 392, 399 (1985). Importantly, a treaty stands on the same footing of supremacy as do the provisions of the Constitution and laws of the United States. *Asakura v. City of Seattle*, 265 U.S. 332, 341, amended, 44 S. Ct. 634 (1924); U.S. Const. art. VI, cl. 2.

Here, the Transit Treaty expressly governs not only the Line 5 "pipeline or any part thereof" but also "all real … property … connected therewith." Transit Treaty, Art. I. The federal policy governing the international flow of hydrocarbon products embodied in the Transit Treaty is clear: "No public authority in the territory of either Party *shall institute any measures*, other than those provided for in Article V, which are intended to, or which would have the effect of, *impeding. . . or interfering with in any way* the transmission of hydrocarbons in transit." *Id.*, Art. II(1) (emphasis added).

A federal court is plainly a public authority, as a public body having authority to make certain decisions on behalf of the United States government. *See, e.g.*, 8 U.S.C. § 1329. *See, e.g.*, *Stern v. Marshall*, 564 U.S. 462, 484 (2011) ("The Constitution assigns that job—resolution of the mundane as well as the glamorous, matters of common law and statute as well as constitutional law, issues of fact as well as issues of law—to the Judiciary." (cleaned up)). The Transit Treaty was obviously intended to bind each country as a whole to this rule of uninterrupted

transmission, given that the singular overarching purpose of this agreement was "to ensure the uninterrupted transmission by pipeline through the territory of one Party of hydrocarbons not originating in the territory of that Party." Transit Treaty, preamble. It would defeat this purpose to conclude that either country's judiciary was unbound by this agreed-upon principle of uninterrupted transmission, especially given the judiciary's broad decision-making and injunctive powers.

Because the United States District Court for the Western District of Wisconsin is bound by the terms of Article II, it could not take any action that would impede or interfere with the flow of hydrocarbons through Line 5. This limitation extends, naturally, to the district court's exercise of its equitable authority.

It is well established that the exercise of the courts' equitable powers may be guided or controlled by federal statutory law. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). For example, the Supreme Court in *Tennessee Valley Authority (TVA) v. Hill*, 437 U.S. 153, 172–73 (1978), held that Congress, through the Endangered Species Act, had foreclosed the exercise of the court's usual discretion and instead *required* the district court in that case to enjoin the completion of the dam that threatened an endangered species of perch. Refusal to enjoin the action in that case would have ignored the "explicit provisions of the Endangered Species Act." *Id.* at 173. Federal law here, as in *TVA*, has "foreclosed the exercise of the usual discretion possessed by a court of equity," *Weinberger*, 456

U.S. at 313, but in this case it does so by prohibiting the district court from interrupting the flow through the line.

**B.    The Band is a "public authority" and equally bound by the Treaty's principle of uninterrupted transmission; it cannot be granted relief in violation of the Transit Treaty.**

Beyond this direct limitation on the federal judiciary's power, the Treaty also constrains the Band as a public authority, making any remedy that would interrupt the flow of hydrocarbons through Line 5 unavailable to it.  "A court of equity cannot . . . create a remedy in violation of law, or even without the authority of law." *Rees v. City of Watertown*, 86 U.S. 107, 122 (1873).  And it "can no more disregard statutory and constitutional requirements and provisions than can courts of law." *Hedges v. Dixon Cnty.*, 150 U.S. 182, 192 (1893).  That is precisely what the district court did here in granting the Band its requested relief to interrupt the transmission of hydrocarbons through Line 5.

The Band falls within Article II's terms first because it is a "public authority." *See, e.g.*, 23 U.S.C. § 101(a)(22) ("The term 'public authority' means [an] . . . Indian tribe.").  And the Band is a public authority within the territory of the United States, given that Indian reservations are "a part of the territory of the United States." *United States v. Rogers*, 45 U.S. 567, 571 (1846).  Because a tribe falls within the territorial sovereignty of the United States, its "exercise of separate power is constrained so as not to conflict with the interests of this overriding sovereignty." *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 209 (1978) (superseded on other grounds by statute).  Accordingly, the Band is subject to the

13

Transit Treaty and cannot institute "any measures" which will "imped[e] or interfer[e]" with the flow of hydrocarbons through Line 5. Transit Treaty, Art. II(1). The Band's request for a permanent injunction ordering the decommissioning of Line 5 before a reroute can be complete does just that. Equity does not permit the district court to grant the Band relief that would inherently sanction the Band's violation of federal law.

\* \* \*

The very point of the Transit Treaty was to ensure that public authorities, such as the district court and the Band, did not take such measures that would interrupt the transmission of hydrocarbons through Line 5. Because the Band's request for injunctive relief and district court's order granting such relief do exactly what the Treaty forbids, this Court should reverse.

## II. The district court failed to apply the proper injunctive standard and to hold the Band to its burden of proving that the public interest would not be disserved.

The Transit Treaty aside, the Court should also reverse because the district court misapprehended the public interest prong of the permanent injunction standard and failed to hold the Band to its burden of proof.

"Critically, a finding of liability on a defendant's part does not automatically give rise to an entitlement to injunctive relief." *Liebhart v. SPX Corp.*, 998 F.3d 772, 779 (7th Cir. 2021). Instead, a permanent injunction is only appropriate "if the applicant demonstrates '(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to

14

compensate for that injury; (3) that, considering the balance of hardships between
the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public
interest would not be disserved by a permanent injunction.'" *Id.* (quoting *eBay Inc.
v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).  Where the moving party does
not satisfy all four elements of this test, the standard has not been met and an
injunction should not issue.  *See LAJIM, LLC v. Gen. Elec. Co.*, 917 F.3d 933, 942
(7th Cir. 2019) (affirming denial of permanent injunction where "plaintiffs failed to
provide the district court with any evidence that injunctive relief . . . would improve
the environment *and not cause additional harm*.") (emphasis added).

The district court acknowledged that "the significant economic and public
policy implications that would arise from a shutdown of Line 5" were relevant to its
analysis but declared that "these concerns can be mitigated *somewhat* by issuing an
injunction that does not necessarily require an immediate, indefinite or permanent
shutdown of Line 5."  6/16/2023 Op. & Order 35, Doc. No. 684, A107.  After
concluding it could not justify "what would amount to a five-year forced easement,"
the court ruled that it would "give Enbridge an additional three years to complete a
reroute" which would "at least give the public and other affected market players
time to adjust to a permanent closure of Line 5."  *Id.* at 51.  The district court
acknowledged there would be some "significant market disruptions," but found
there would be "fewer" if injunctive relief were delayed three years.  *Id.* at 36.

*Less* disservice to the public interest is not the standard articulated in
*Leibhart* and *LAJIM, LLC* cited above.  These cases require the Band to show the

15

public interest will *not* be *disserved*. *eBay Inc.*, 547 U.S. at 391. The district court did not hold to this standard, and the Band did not satisfy it.

In its arguments below, the Band improperly turned the standard on its head, focusing on the ways in which it believed the public interest *would* be served by an injunction requiring the removal of Line 5 from the Band's tribal lands. For example, in support of its motion for partial summary judgment and request for injunctive relief, the Band argued that "[t]he public interest is certainly well served" by protecting its treaty rights, sovereignty, and rights of self-government. Pls.' Mem. Supp. Partial Summ. J. 58, Doc. No. 172. "By contrast," the Band continued, "the public interest self-evidently is not 'enhanced by permitting defendants to continue to violate federal law." *Id.* at 59 (quoting *Boles v. Earl*, 601 F. Supp. 737, 748 (W.D. Wis. 1985)). Moreover, the Band argued, the public interest "is promoted 'by preventing conduct Congress declared illegal[.]'" *Id.* (quoting *CSC Holdings, Inc. v. Greenleaf Elecs., Inc.*, No. 99 C 7249, 2000 WL 715601, at *7 (N.D. Ill. June 2, 2000)). Alleging that the continued operation of Line 5 violated its treaty rights, the Band argued that "[n]o conception of the public interest should countenance a continuation of that lawlessness." *Id.* Similarly, in support of its motion for emergency injunctive relief, the Band focused exclusively on how "the public interest will be served by an injunction." Pls.' Mem. Supp. Emergency Mot. Inj. Relief 15-16, Doc No. 629.

Whether the public interest is "well served," "not enhanced," or "promoted" by the Band's proposed permanent injunction misses the mark. Instead, the Band was

obligated to prove, by a preponderance of the evidence, "that the public interest would *not* be *disserved* by a permanent injunction." *LAJIM, LLC*, 917 F.3d at 944 (emphasis added). This it failed to do. Indeed, even the Band recognized that the removal of Line 5 from the Band's tribal lands before the reroute is complete will result in energy shortfalls. *See, e.g.*, Pls.' Trial Br. 90-95, Doc. No. 556; *id.* at 91 (submitting that "the evidence will show that the shortfall can be reduced substantially further, and again in a short period of time); *id.* at 92 (describing steps that "would go a long way towards eliminating any shortfall in crude oil supply in the Line 5 market area").

The district court apparently concluded that it simply could not justify denying the injunction based on harm to the public interests where a trespass is involved. 6/16/2023 Op. & Order 50-51, Doc. No. 684, A122-23. But neither the Band nor the district court pointed to any statute that alters the equitable factors or mandates injunctive relief every time a trespass is found. *See, e.g.*, *TVA*, 437 U.S. at 172–73. Indeed, where significant public interests are involved, a court's "equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." *Kansas v. Nebraska*, 574 U.S. 445, 456 (2015) (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)).

The strong public interest in a supply of natural gas at affordable prices is obvious. *See, e.g.*, *Guardian Pipeline, L.L.C. v. 295.49 Acres of Land*, No. 08-C-0028, 2008 WL 1751358, at *23 (E.D. Wis. Apr. 11, 2008) ("The need for natural gas supply is a 'substantial public interest.'"); *Williams Pipe Line Co. v. City of Mounds*

17

*View, Minn.*, 651 F. Supp. 551, 570 (D. Minn. 1987) (stating that "important" public interests include "an interest in the continued operation of petroleum pipelines"); *Texas E. Transmission Corp. v. Giannaris*, 818 F. Supp. 755, 760–61 (M.D. Pa. 1993) (stating that the public interest is served by enjoining landowners from impeding access to a pipeline). And there is no applicable law that relieves the Band as a landowner from its burden of satisfying the standard for seeking permanent injunctive relief by demonstrating, among other things, that the public interest would not be disserved. It was legal error for the district court to alter that standard on its own accord and relieve the Band of that burden.

## III. Given the serious consequences to the public of shutting down Line 5, the district court's imposition of a three-year shutdown timeline is an abuse of discretion.

Even if the district court had discretion to interrupt the transmission of hydrocarbons through Line 5 and had applied the proper standard in crafting its equitable relief, the injunction entered was an abuse of discretion given the real risks of serious harm to the public. In deciding whether to issue injunctive relief, a court "weighing the interests of the private parties and the public interest should try to 'minimize the costs of being mistaken.'" *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 902 (7th Cir. 2001) (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)). The district court did not reasonably exercise that caution here, as it gave no weight to the serious risk of harm to hundreds of thousands of residents and businesses from its permanent injunction.

18

While the district court found that "three years will at least give the public and other affected market players time to adjust to a permanent closure of Line 5," 6/16/2023 Op. & Order 51, Doc. No. 684, A123, finding an "adjustment" will occur is quite far from finding no harm to the public will result. Indeed, the district court essentially found exactly the opposite—that harm would result. After acknowledging the "significant economic and public policy implications that would arise from a shutdown of Line 5," the district court simply declared that these significant harms can be "mitigated somewhat" by a three-year delay. *Id.* at 35.

If the injuries to the public are somewhat lessened by the injunction's timeline, one is left wondering what harms will remain. Of the 176,000 primary homes in Michigan relying on propane transported by Line 5, will only 100,000 suffer without heat because the harms of Line 5's closure have been *somewhat* mitigated? 10/28/2022 (Morning) Trial Tr. 41-42, Doc. No. 603; Br. of *Amici Curiae* Propane Ass'ns 3 n.5, Doc. No. 657 (citing MPSC Report at pp. 121, 131–132). Despite recognizing that some significant impact on the public would remain, the district court entered an order that would cause this harm anyway without any finding or consideration as to what the harm would be. Equity cannot countenance this disregard for the remaining risk of serious harm to the enormous public interests at stake.

Line 5 provides an essential supply of propane and other hydrocarbons used by the commercial, industrial, agricultural, and residential sectors in Michigan, Wisconsin, and the broader region. Residents rely on it for heating and cooking in

19

their homes.  Businesses rely on it for heating and fuel for their operations.  The public depends on the continued supply of these hydrocarbons to satisfy its need for energy at affordable prices.  *See* 11/28/2022 Op. & Order 11, Doc. No. 612, A67 (recognizing the importance of "preserving operation of Line 5 for those areas of the United States and Canada that currently depend upon it"); Earnest Report 15, Doc. No. 262 (describing residential and commercial uses of propane for heating and cooking); Expert Report of Dr. Corbett Grainger 15-17, 23, Doc. No. 493 (detailing impact of a Line 5 closure on households in Michigan and Wisconsin through acute increases in the price of propane for heating); Decl. of Superior Supp. Defs.' Opp'n Mot. Inj. ¶¶ 5-7, SA 100-01 (declaration of propane distributor which relies on Line 5 describing consequences of shutdown on American and Canadian residential and commercial customers).

Shutting down the line would undisputedly force refineries to close, cause thousands of jobs to be lost, raise energy prices, and potentially cause shortages. As Enbridge's expert explained to the district court, market players would not begin to make significant investments in developing alternative transportation options for the crude oil and NGLs currently flowing through Line 5 until its permanent shutdown became a certainty without a reroute.  *See* 10/28/2022 (Afternoon) Trial Tr. 111-119, Doc. No. 610.  "In a circumstance where the reroute option is live," Neil Earnest explained, "it'll effectively paralyze the market."  *Id.* at 111.  Market stakeholders will not begin to make these transportation adjustments while the reroute efforts continue because of the concern that these investments will become

stranded assets. *Id.* Line 5 is the lowest-cost delivery method for crude and NGLs to this market area, superior to rail and truck transloading alternatives. *Id.* at 112. Other modes of delivery cannot compete with it. As Mr. Earnest explained, "once Line 5 restarts, all that stuff—all the transloading and rail-unloading facilities—would be idled and, thus, a stranded asset." *Id.*

Short of severe price increases, market players will likely refuse to invest in expensive transportation alternatives to Line 5—like, for example, $100 million crude oil unloading facilities—only for them to be used for a relatively short period of time between the shutdown of Line 5 and its reopening once the reroute is finished. *Id.* The district court clarified its understanding of this issue by asking, "So you wouldn't invest in that kind of permanent solution until it was clear that Line 5 would not reopen?" *Id.* at 113. The answer is obviously yes. *Id.* Mr. Earnest was directly asked to consider the hypothetical situation where the court ordered Line 5 to be decommissioned within three years and the reroute was still being pursued at that time—would there be investment of the type that would be necessary to fill the gaps? *Id.* at 114. "In that circumstance," Mr. Earnest answered, "industry will not make significant capital investment because of the concern about stranded assets." *Id.* at 115.

If there would be some adjustment, there is no evidence that there would be much of one, and the district court did not even conclude there would be. In fact, not even the Band's own experts took that position. The existence of their proposed alternative sources of propane were all premised on Line 5's actual shutdown

occurring first.  Band expert Jill Steiner, for example, testified that her proposed alternatives "would not crop up immediately in the wake of a Line 5 shutdown." 10/28/2022 (Morning) Trial Tr. 83, Doc. No. 603.  And Band expert Chris Barber testified that the time needed to get temporary possible replacements for Line 5 would be one to three years "out from a shutdown."  10/31/2022 (Morning) Trial Tr. 7, Doc. No. 604.

If injunctive relief is allowed and called for, the district court must craft an injunction that avoids a significant risk of serious harm to innocent persons, namely, those dependent on propane to heat their homes, cook their food, and fuel their businesses, not to mention the industries and employees that depend on the existing distribution network, such as the Propane Associations' members.  The district court is required to err on the side of great caution where such weighty public interests as keeping homes heated and keeping businesses open are involved. The district court abused its discretion here in dismissing those risks and consequences, and instead entering an injunctive order that presents a significant and therefore unacceptable risk of causing serious harm to hundreds of thousands of members of the public.  That order should be reversed.

## CONCLUSION AND REQUESTED RELIEF

For the reasons set forth above, the Propane Associations respectfully request that this Court reverse the district court's permanent injunction order.

22

Dated: September 18, 2023               */s/ Gaëtan Gerville-Réache*

                                              Gaëtan Gerville-Réache (P84538)
                                              Ashley L. Yuill (P84429)
                                              Warner Norcross + Judd LLP
                                              1500 Warner Building
                                              150 Ottawa Avenue NW
                                              Grand Rapids, MI 49503
                                              Telephone: (616) 752-2000
                                              greache@wnj.com
                                              ayuill@wnj.com

                                              *Attorneys for Amici Curiae Michigan*
                                              *Propane Gas Association, National Propane*
                                              *Gas Association, and Wisconsin Propane Gas*
                                              *Association*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing *amici curiae* brief complies with the type-volume limitation pursuant to Fed. R. App. P. 29(a)(5) and Circuit Rule 29.  The foregoing brief contains 5,647 words of Century Schoolbook 12-point proportional type.  The word processing software used to prepare this brief was Microsoft Word 2016.

Dated: September 18, 2023

*/s/ Gaëtan Gerville-Réache*
Gaëtan Gerville-Réache (P84538)
Ashley L. Yuill (P84429)
Warner Norcross + Judd LLP
1500 Warner Building
150 Ottawa Avenue NW
Grand Rapids, MI 49503
Telephone: (616) 752-2000
greache@wnj.com
ayuill@wnj.com

*Attorneys for Amici Curiae Michigan Propane Gas Association, National Propane Gas Association, and Wisconsin Propane Gas Association*

## CERTIFICATE OF SERVICE

I certify that on September 18, 2023, I caused a true and correct copy of the foregoing brief to be serve via the Court's ECF system upon all counsel of record. I also certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: September 18, 2023

*/s/ Gaëtan Gerville-Réache*
Gaëtan Gerville-Réache (P84538)
Ashley L. Yuill (P84429)
Warner Norcross + Judd LLP
1500 Warner Building
150 Ottawa Avenue NW
Grand Rapids, MI 49503
Telephone: (616) 752-2000
greache@wnj.com
ayuill@wnj.com

*Attorneys for Amici Curiae Michigan Propane Gas Association, National Propane Gas Association, and Wisconsin Propane Gas Association*