Nos. 23-2309, 23-2467

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION,
Plaintiff-Appellee, Cross-Appellant,

v.

ENBRIDGE ENERGY COMPANY, INC., AND ENBRIDGE ENERGY, L.P.,
Defendants-Appellants, Cross-Appellees.

ENBRIDGE ENERGY COMPANY, INC., AND ENBRIDGE ENERGY, L.P.,
Counter-Plaintiffs, Appellants/Cross-Appellees,

v.

BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION, and NAOMI TILLISON,
Counter-Defendants, Appellees/Cross-Appellants.

Appeal from the U.S. District Court for the Western District of Wisconsin,
No. 3:19-cv-602-wmc, Judge William M. Conley

# SUPPLEMENTAL BRIEF OF BAD RIVER BAND IN RESPONSE TO
# AMICUS CURIAE BRIEF OF THE UNITED STATES

Paul D. Clement
Matthew D. Rowen[*]
James Xi[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

[*] Supervised by principals of the firm who are members of the Virginia bar

(Additional counsel on inside cover)

Riyaz A. Kanji
David A. Giampetroni
Lucy W. Braun
Josh C. Handelsman[*]
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400

[*] Supervised by principals of the firm who are members of the Michigan bar

Erick Arnold
BAD RIVER BAND OF THE LAKE
SUPERIOR TRIBE OF CHIPPEWA INDIANS
OF THE BAD RIVER RESERVATION
72682 Maple Street
Odanah, WI 54861
(715) 682-7107

Jane G. Steadman
KANJI & KATZEN, P.L.L.C.
811 1st Avenue, Suite 630
Seattle, WA 98104
(206) 344-8100

Bruce Wallace
HOOPER HATHAWAY PRICE BEUCHE
& WALLACE
126 S. Main Street
Ann Arbor, MI 48104
(734) 662-4426

*Counsel for the Bad River Band of the Lake Superior Tribe of Chippewa Indians and Naomi Tillison, Director of the Mashkiiziibii Natural Resources Department of the Bad River Band, in her official capacity*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................iii

INTRODUCTION ........................................................................................... 1

ARGUMENT................................................................................................... 8

I.      The United States Correctly Concludes that Enbridge Is
        Trespassing, and Its Analysis Confirms that Enbridge's
        Interpretation of the 1992 Agreement Fails. ............................................. 8

II.     The United States Fails To Explain Why Enbridge's Trespass
        Should Not Be Promptly Enjoined in Keeping with
        Congress's Express Protections of the Band's Rights........................... 12

        A.      The United States Fails to Address the Plain Text of the Non-
                Intercourse and Right-of-Way Acts ...............................................14

        B.      The United States Fails To Explain How the District Court Was
                at Liberty To Substitute Its Conception of the Public Interest for
                That of Congress…………………………………………………. 19

III.    This Court Should Reject the United States' Suggestion for
        an Open-Ended Remand. ....................................................................... 24

        A.      The District Court Has Already Taken into Account Many of the
                Considerations the United States Advances as Subjects for
                Remand……………………………………………………………..25

                1.      Canada's Interests and the Economic Effects of a Line 5
                        Shutdown. ..............................................................................25

                2.      Reroute Timing …………………………………………..30

3.    The Band's Sovereign Rights …………………………...34

B.    The Additional Considerations Advanced by the United States Provide No Basis for a Remand ……………………………36

1.    Transit Treaty Liability ……………………………………37

2.    Diplomatic Relations with Canada ………………………41

IV.    The United States Correctly Argues that the District Court Erred in Its Disgorgement Award. ......................................................... 43

A.    Core Principles of Restitution and Federal Law Strongly Favor Disgorgement of All Profit Enbridge Has Earned from Line 5 While Trespassing. ……………………………………………..44

B.    Disgorgement of Less than the Avoided-Cost Calculation Would Violate Core Principles of Restitution and Fundamentally Undermine Federal Law. ……………………..49

C.    For any Period of Continued Trespass, Enbridge Should Be Required to Disgorge All Its Profits…………………………..56

V.    The United States Misapplies the Law of Displacement. ..................... 57

# TABLE OF AUTHORITIES

**Cases**

*Aid for Women v. Foulston,*
  441 F.3d 1101 (10th Cir. 2006) ........................................................................ 27

*American Electric Power Co. v. Connecticut,*
  564 U.S. 410 (2011) .................................................................................... passim

*City of Milwaukee v. Illinois,*
  451 U.S. 304 (1981) ........................................................................................ 60

*City of Sherrill v. Oneida Indian Nation of New York,*
  544 U.S. 197 (2005) ........................................................................................ 17

*Halczenko v. Ascension Health,*
  37 F.4th 1321 (7th Cir. 2022) ........................................................................ 39

*Herrera v. Wyoming,*
  139 S. Ct. 1686 (2019) .................................................................................... 21

*Johnson v. Cherry,*
  256 F. App'x 1 (7th Cir. 2007) ...................................................................... 23

*Kamen v. Kemper Financial Services, Inc.,*
  500 U.S. 90 (1991) .......................................................................................... 48

*Kansas v. Nebraska,*
  574 U.S. 445 (2015) ........................................................................................ 47

*Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin v. Evers,*
  46 F.4th 552 (7th Cir. 2022) .......................................................... 2, 17, 21, 23

*Liu v. Securities & Exchange Commission*,
   591 U.S. 71 (2020) ........................................................................ 48

*Matter of Greenig*,
   152 F.3d 631 (7th Cir. 1998) ......................................................... 22

*McGirt v. Oklahoma*,
   140 S. Ct. 2452 (2020) ................................................................... 18

*Maryland Department of Human Resources v. U.S. Department of Agriculture*,
   976 F.2d 1462 (4th Cir. 1992) ........................................................33

*Merrion v. Jicarilla Apache Tribe*,
   455 U.S. 130 (1982) ........................................................ 1, 2, 11, 21

*Michigan v. U.S. Army Corps of Engineers*,
   667 F.3d 765 (7th Cir. 2011) ............................................. 6, 59, 60, 61

*Northern Cheyenne Tribe v. Hodel*,
   851 F.2d 1152 (9th Cir. 1988) ....................................................... 27

*Oneida Nation v. Village of Hobart*,
   968 F.3d 664 (7th Cir. 2020) ........................................................... 4

*Pollard v. Johnson*, 23-cv-135-wmc,
   2023 WL 6276403 (W.D. Wis. Sept. 23, 2023) ............................... 16

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009) ....................................................... 39

*Swinomish Indian Tribal Community v. BNSF Railway Co.*,
   2022 WL 3597439 (W.D. Wash. Aug. 23, 2022) ............................46

*United States v. Blitch*,
   622 F.3d 658 (7th Cir. 2010) .................................................................. 23

*United States v. Choctaw Nation*,
   179 U.S. 494 (1900) ................................................................................. 22

*United States v. Oakland Cannabis Buyers' Cooperative*,
   532 U.S. 483 (2001) ............................................................................ 14, 20

*United States v. Osage Wind*, 4:14-cv-00704-JCG-JFJ,
   2023 WL 8813867 (N.D. Okla. Dec. 20, 2023) ............................... 20, 45

*Washington v. Washington State Commercial Passenger Fishing Vessel
Association*,
   443 U.S. 658 (1979) ..........................................................17, 18, 22, 23

*Winkler v. Eli Lilly*,
   101 F.3d 1196 (7th Cir. 1996) ............................................................... 39

**Treaties**

Agreement Between the Government of the United States and
   the Government of Canada Concerning Transit Pipelines, 28
   U.S.T. 7449, 1977 WL 181731 (Jan. 28, 1977) ........................................ passim

Treaty with the Chippewa, 10 Stat. 1109 (Sept. 30, 1854) ....................2, 21, 48

**Statutes**

25 U.S.C. § 177 ............................................................................ 3, 13, 15, 16

25 U.S.C. § 321 ........................................................................................... 13

25 U.S.C. § 323 ...................................................................................... 3, 13

25 U.S.C. § 324 .................................................................................. 3, 13, 15

28 U.S.C. § 517 ........................................................................................ 36

33 U.S.C. § 403 ........................................................................................ 20

33 U.S.C. § 1341(a)(2) ............................................................................. 32

49 U.S.C. § 60102(1)(2) ............................................................................. 7

49 U.S.C. § 60102(a)(2) ........................................................................... 58

49 U.S.C. § 60104(e) ............................................................................... 59

49 U.S.C. § 60121(a)(1) ........................................................................... 62

**Regulatory Materials**

49 C.F.R. § 195.401 ................................................................................. 60

49 C.F.R. § 195.450 ................................................................................. 61

49 C.F.R. § 195.452 ................................................................................. 61

84 Fed. Reg. 14,715-01 (Apr. 11, 2019) ................................................ 61

84 Fed. Reg. 18,919-01 (May 2, 2019) ................................................... 61

87 Fed. Reg. 33,576-01 (June 2, 2022) .................................................. 61

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ................................................ 38

Charles Wilkinson, *Treaty Justice: The Northwest Tribes, the Boldt Decision, and the Recognition of Fishing Rights* chs. 11-12 (2024) ......................................18

Congressional Research Service, DOT's Federal Pipeline Safety Program: Background and Key Issues for Congress Summary (Mar. 10, 2022)...........65

Restatement (Third) of Restitution and Unjust Enrichment
  (2011) ............................................................................................ 47, 48, 51

*Tribes Order Company To Remove Its Pipeline [After] Talks on New Lease of Corridor Across Reservation Break Down*, The Spokesman-Review (Nov. 3, 1995), https://www.spokesman.com/stories/1995/nov/03/tribes-order-company-to-remove-its-pipeline-talks..............................................................51

**INTRODUCTION**

1. The United States leaves no doubt that Enbridge is trespassing on the Band's land. Congress has provided that the only lawful means for a pipeline to traverse tribally owned lands is through the issuance of an easement by the Secretary of the Interior with tribal consent. U.S.Br.11-12. Enbridge's easements for the Allotted Parcels expired on June 2, 2013. The plain terms of those instruments required Enbridge to vacate the parcels within six months thereafter. It has been in conscious trespass ever since.

Because the lack of a federally issued easement disposes of the trespass issue, the government does not directly address the 1992 Agreement. But two aspects of its briefing undermine Enbridge's contention that the Agreement extends beyond the thirteen 50-year parcels that were its object.

First, the Band acted as a sovereign in declining to renew easements across the 20-year parcels. U.S.Br.7, 31. Under *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982), the 1992 Agreement would need to surrender that authority "in terms which admit of no other reasonable interpretation," *id*. at 148 (quotation marks omitted), and it does not.

1

Second, the government makes clear that Secretarial approval of rights-of-way on tribal lands "is not just a rubber stamp." U.S.Br.21. In the 1992 Agreement, the Band agreed to use its best efforts to help secure that approval, and it complied by supporting the Secretary's issuance of a 50-year easement for those thirteen parcels. That commitment need not be stretched to other parcels mentioned nowhere in, and not covered by, the Agreement in order to have enjoyed real meaning.

2. Four unambiguous provisions of federal law govern this case. The United States recognizes their force in making its trespass liability argument, but then fails to acknowledge that they also determine the proper remedy.

The 1854 Treaty with the Chippewa reserved for the Band a "permanent home" from which it "'shall not be required to remove'," *Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wis. v. Evers*, 46 F.4th 552, 559–60 (7th Cir. 2022) (quoting 10 Stat. 1109, art. 11 (Sept. 30, 1854)), and thereby guaranteed the Band's "'power to exclude' others from the Band's lands," U.S.Br.31.&.n.6 (quoting *Merrion*, 455 U.S. at 144). The Non-Intercourse Act,

2

25 U.S.C. § 177, "prohibits the conveyance of any interest in tribal lands absent congressional consent." US.Br.11. The Right-of-Way Act gives "the Secretary … sole authority to grant access to or use of Indian trust lands" and "requires tribal consent[.]" US.Br.11-12 (citing 25 U.S.C. §§ 323-24). Finally, the expired easements, as noted, required Enbridge to vacate the 20-year parcels "within six months of termination." US.Br.5 (quoting BA32).

Taken together, these provisions should render straightforward the determination of remedy in this case. Enbridge long ago lost any right to operate its pipeline on the 20-year parcels. Congress has mandated that it can only regain that right if the Secretary issues a new easement, which the Secretary—in adherence to Congress's requirement of tribal consent—has not done. And Congress has proscribed the conveyance of an interest in the Band's lands by any other means "in law or in equity." 25 U.S.C. § 177. As a result, the only cognizable option is for Enbridge to comply with the terms of its now-expired easement and vacate the Band's lands within six months, as it should have done more than a decade ago.

3

There is nothing radical about this conclusion. Other, law-abiding pipeline companies have terminated their operations on tribal land when their easements expired, either voluntarily or in response to legal action. *Infra* pp. 45-46. The Transit Treaty assuredly does not warrant a different outcome. In what this Court has described as "a strong clear-statement rule," *Oneida Nation v. Vill. of Hobart*, 968 F.3d 664, 674 (7th Cir. 2020), Congress diminishes tribal rights only when it makes plain its intent to do so, and the Transit Treaty is bereft of any such indication.

3. The government has been remarkably reluctant to share its views, belatedly doing so only at this Court's instigation. Having failed to weigh in sooner, the government now invites a remedial do-over so that the district court can mull the government's less than definitive observations about this case. In doing so, the government inadvertently demonstrates the perils of straying from Congress's clear edicts. The government argues that the district court should weigh a potpourri of factors, many of which the court already considered, and others that it reasonably determined are not susceptible to fair assessment (and none of which the United States

4

advanced for the court's consideration below). And while the factors advanced by the government cannot justify a decision to deny or further delay enforcement of the Band's rights, the upshot of the government's suggestion would be to wipe from the books a shutdown date that, while too far in the future to comply with the law, at least provides a measure of certainty that Enbridge's decade-long trespass will come to an end.

The government makes clear that Enbridge is in trespass and cannot simply maintain the status quo. The last thing the parties or the markets need now is a remand and do-over to consider the government's lukewarm submissions about the equities.

4. The government properly characterizes the district court's restitution award as "paltry," U.S.Br.46, and as contravening the twin goals of restitution: deprivation of wrongful gains and deterrence of further wrongdoing, U.S.Br.41. The government suggests a remand to determine the proper measure of an award. But again, what the Band deserves and the market needs is a meaningful restitution award that will incentivize Enbridge to bring its conceded trespass to an end.

To properly fulfill restitution's objectives, this Court should require disgorgement of Enbridge's full profits during the period of trespass. If it is not inclined to do so, it should at the very least award (or instruct the district court to award) the full amount Enbridge saved by delaying its reroute, plus the additional amount of Enbridge's past trespass profits it concludes is consistent with principles of equity and restitution. In addition, Enbridge should be required to disgorge the full amount of Line 5 profits for any period of further trespass, as there is no warrant for Enbridge continuing to profit handsomely from its ongoing illegal occupation of sovereign lands.

5. Neither governing law nor practical considerations justify the government's eleventh-hour suggestion that the Band's nuisance claim is displaced by the Pipeline Safety Act. The test is whether the statute "speaks directly to the question at issue." *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 778 (7th Cir. 2011) (quotation marks omitted). The government relies principally on the Act's direction to the Department of Transportation to prescribe minimum safety standards for pipelines, 49

U.S.C. § 60102(1)(2), but never establishes that safety standards encompass the permissible distance between pipelines and migrating rivers. To the contrary, that issue involves inherently local, case-by-case determinations that do not lend themselves to uniform standards but instead are well suited to common law adjudication.

The Department has never understood its statutory charge to include the regulation of river migration issues, and while the Band appreciates the government's suggestion of Department involvement in ensuring safety at the meander, granting the federal government the *exclusive* authority to oversee the meander and countless other local conditions courts disaster. The government falls well short of establishing that its involvement should come at the expense of a continued role for the Band and the district court—whose efforts resulted in the establishment of the enforceable shutdown and purge plan that the Department now endorses.

## ARGUMENT

I.   **The United States Correctly Concludes that Enbridge Is Trespassing, and Its Analysis Confirms that Enbridge's Interpretation of the 1992 Agreement Fails.**

The United States recognizes that Enbridge has knowingly been trespassing on the Allotted Parcels since 2013 because it has not obtained a right-of-way across those parcels from the Interior Department, rendering it unnecessary for the Court to address the 1992 Agreement. *See* U.S.Br.16-22. The Band agrees that the lack of a federally issued right-of-way is wholly sufficient to affirm the district court's holding that Enbridge has been willfully trespassing since 2013, as Congress has made Interior approval (predicated on tribal consent) an ironclad requirement for rights-of-way across tribal lands. Band.Opening.Br.50-55.&.55.n.7. Moreover, while the United States "expresses no opinion about the interpretation of the 1992 Agreement," U.S.Br.16, its discussion of the federal process for approving rights-of-way confirms that Enbridge's interpretation of the 1992 Agreement fails.

8

Enbridge has argued that Section 3 of the 1992 Agreement compels the Band to consent to easements on all parcels along the pipeline corridor, even parcels in which the Band only acquired an interest after 1992. Enbridge.Opening.Br.19-28. The district court correctly rejected this elephant-in-a-mousehole reading of Section 3, noting that the 1992 Agreement was expressly limited to the thirteen wholly owned Tribal Parcels at the time and that Section 3 simply obligated the parties to use their best efforts to secure a 50-year easement from the United States on those thirteen parcels. A15-A17; *see also* Band.Opening.Br.41-45.

At oral argument, Enbridge introduced a new variation of its Section 3 argument, asserting that because the Band consented to easements on the thirteen Tribal Parcels in Section 1 of the 1992 Agreement, Section 3 has "independent meaning" only if it creates Band obligations vis-à-vis *different* parcels acquired in the future. Oral.Arg.3:26. That is plainly wrong for reasons made clear in the government's brief: after signing the 1992 Agreement, the parties *still needed to obtain Interior's approval of the easement across the thirteen Tribal Parcels. As the United States explains, federal

approval of a right-of-way "is not just a rubber stamp. Interior must make its own determination that any proffered written consent of the Band meets the statutory and regulatory criteria." U.S.Br.21. Accordingly, even with the Band consent supplied in Section 1, there was no guarantee that the BIA would approve a 50-year easement over the thirteen parcels at issue.

Section 3, then, obligated the Band to take all reasonable actions—even if "not expressly described" in the Agreement, BA23—that might help obtain federal approval of the 50-year right-of-way on the thirteen parcels. As the district court explained, the Band fulfilled that obligation: consistent with the fact that its approval was no rubber stamp, the BIA expressed concerns about the 50-year term, and the Band responded with an explanation as to why it leaned towards it. *See* A5, A16. The BIA, which had expressly confirmed its understanding that the 1992 Agreement was limited to "13 parcels of tribal trust lands," BA25, thereafter issued a 50-year easement expressly "limited to" those thirteen parcels, BA27-30. Enbridge has grappled with none of this. Its "independent meaning"

10

argument simply ignores the critical role of the federal government in approving rights-of-way on Indian lands.[1]

The government's brief also defeats Enbridge's contention that the Band is acting as a private landowner, Enbridge.Reply.12; Oral.Arg.2:53, 7:05. As the United States explains, the Band acted as a sovereign in declining to renew the company's easements: "The Band's sovereign, property, and treaty rights include the power to exclude or place conditions on Enbridge's continued presence on tribal lands within the Reservation." U.S.Br.7. Accordingly, the standard of *Merrion*, 455 U.S. at 141, 144, governs, and the Band cannot be deemed to have surrendered its authority to exclude Enbridge absent "unmistakable" textual evidence of its intent to do so, *id.* at 148. Enbridge's Section 3 argument does not come close to clearing this bar. *See* Band.Opening.Br.45.

---

[1] Section 3's reference to consents and authorizations "whether necessary or not," BA23, is reflected in Section 1.d's reference to three separate documents to be provided by the Band, BA21-22, only the first of which was necessary to legally consummate the 50-year easement, and all of which remained subject to the still-ongoing "Tribal approval process," § 7, BA23, and were thus logically subject to a further assurances clause.

11

Indeed, before concocting its Section 3 argument for this litigation, Enbridge admitted in real time that it was trespassing. *See, e.g.*, BA65 ("We are currently operating in trespass as they spelled out in their lawsuit."); BA60 ("Our easements … are expired and the Band has the ability to hold Enbridge in trespass and likely require removal of the pipeline."); *see also* BA54, 58, 62, 66 (describing Enbridge as "currently in trespass" and "in trespass since 2013"). Those candid, contemporaneous assessments—not any post-hoc lawyering—get it right.

## II. The United States Fails To Explain Why Enbridge's Trespass Should Not Be Promptly Enjoined in Keeping with Congress's Express Protections of the Band's Rights.

In its briefing, the United States confirms:

- "Enbridge is in trespass on the Band's lands, has been for many years, and agreed when it initially acquired the easements that expired in 2013 to remove all equipment and installations within six months of the easements' termination." U.S.Br.37.

- "Enbridge … owes a duty to the Band and to the United States to end its trespass and resolve the issues the trespass has created." *Id.* at 38. Instead, "Enbridge is consciously trespassing on tribal land." *Id.* at 6.

12

- "[T]he Band's sovereign, property, and treaty rights include the power to exclude or place conditions on Enbridge's continued presence on tribal lands within the Reservation." *Id.* at 7.

- "The Indian Non-Intercourse Act, 25 U.S.C. § 177, broadly prohibits the conveyance of any interest in tribal lands absent congressional consent. In the Indian Right-of-Way Act and 25 U.S.C. § 321, Congress provided consent for pipeline rights-of-way and gave the Secretary of the Interior sole authority to grant access to or use of Indian trust lands. *See* 25 U.S.C. § 323 …. The statute requires tribal consent for rights-of-way over a Tribe's lands. 25 U.S.C. § 324[.]" *Id.* at 11-12 (citation omitted).

- "Enbridge must follow the requirements of the Indian Right-of-Way Act and implementing regulations to obtain a legal right to keep its pipeline on the Band's land—it must secure a right-of-way from Interior [with the Band's consent]. It is undisputed that Enbridge has not done so[.]" *Id.* at 12 (citation omitted).

Despite all this, the government declares that "[d]evising the appropriate remedy for this trespass … is not a simple matter." *Id.* at 6. But any alleged complexity is of the United States' own making. It nowhere explains why the Non-Intercourse Act's clear prohibition of unauthorized conveyances "in law or equity" of interests in tribal lands, 25 U.S.C. § 177, and the Right-of-Way Act's equally clear requirement of tribal consent, *id.* § 324, do not preclude a judicial blessing of Enbridge's continued occupation of the Band's lands.

Nor does the United States explain why, even if the district court had discretion to apply the traditional injunction test here, it was free to substitute its conception of the public interest for that of Congress. *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483 (2001). Here, Congress has codified tribal consent as a clear prerequisite to the encumbrance of tribal lands, despite full awareness of the countervailing benefits—including economic efficiency—that might be served by making those lands eligible for condemnation. *See* Band.Opening.Br.7-10.

A.     **The United States Fails To Address the Plain Text of the Non-Intercourse and Right-of-Way Acts.**

While acknowledging that "immediate ejectment [is] the appropriate remedy" in "most cases of trespass on Indian lands," U.S.Br.35, the United States disagrees that the district court is bound under the Non-Intercourse and Right-of-Way Acts to put a prompt end to the trespass on the Band's lands, *id.* at 36 & n.7. The government relies on the general distinction between rights and remedies, *id.* at 33-34, but concedes that remedial discretion must yield where "a statute clearly provides otherwise," *id.* at 34 (quoting *Oakland Cannabis*, 532 U.S. at 496). It then fails entirely to address

14

the Non-Intercourse Act's prohibition against unauthorized conveyances of tribal land interests "in law or equity," 25 U.S.C. § 177, and the Right-of-Way Act's clear prohibition against any "right-of-way … across any lands belonging to a tribe … without the consent of the proper tribal officials," *id.* § 324.

That text cannot simply be wished away. The government's suggestion that the district court may equitably permit Enbridge to operate its pipeline on lands where it "lacks the rights-of-way required by federal law for [such operation]," U.S.Br.6, plainly runs afoul of Congress's clear edict that only the Interior Department, with the consent of the affected tribe, may convey such a right. The statutory text more directly constrains a court's equitable discretion than other enactments that the Supreme Court and this Court have held to eliminate it, *see* Band.Reply.17-18, and the government supplies no sound basis for ignoring that text here.

The government's argument that the Non-Intercourse Act does not "prescribe[] specific remedies for violations" of its terms, U.S.Br.35, is a category error. The Band does not seek a *remedy* for a Non-Intercourse Act

15

violation. It seeks to *prevent* a violation in the first instance via a judicial conveyance to Enbridge of a right to continue occupying the Band's lands in purported remedy of its trespass. *See* Band.Opening.Br. 73-77; Band.Reply.16-21. Congress could not have been clearer in proscribing such a conveyance, whether "in law or equity," 25 U.S.C. § 177, absent its authorization. As the United States argued to the same district court judge just last year, the 1948 Right-of-Way Act "provides such an authorization" contingent on the "fundamental requirement[]" of tribal consent. Amicus Brief of the United States at 4, *Pollard v. Johnson*, 23-cv-135-wmc, 2023 WL 6276403 (W.D. Wis. Sept. 23, 2023), 2023 WL 3598563. For a court to allow use of a tribe's land as an equitable remedy absent compliance with the 1948 Act would "strip the Band of its [sovereign] right … to exclude individuals from its land," *id.* at 17, "bypass Congress' statutory mandate," *id.* at 15, "violate Congress' will," *id.*, and "violate both the ROW Act and the Non-Intercourse Act," *id.* at 17. Such relief is therefore "preempted by federal law." *Id.*

16

The United States' passing reference to *City of Sherrill v. Oneida Indian Nation of New York*, 544 U.S. 197 (2005), U.S.Br.34, does not help. The government fails to acknowledge that this Court has already rejected the applicability of *Sherrill's* equitable reasoning to the Band and its Reservation. *See Lac Courte Oreilles*, 46 F.4th at 569-70; Band.Opening.Br.76; Band.Reply.22. Moreover, *Sherrill* does not purport to interpret the requirements of the Non-Intercourse Act (indeed, the Act appears nowhere in *Sherrill*'s merits discussion, *see* 544 U.S. at 213-221).

The government's reliance on *Fishing Vessel* is even more surprising. *See* U.S.Br.34 (citing *Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 685-88 (1979)). *Fishing Vessel* is a treaty rights case—and one that stands for upholding such rights in the face of strident opposition rather than the opposite. There, the Supreme Court construed a treaty reserving tribal fishing rights "in common with" non-Indians as requiring an equitable apportionment of the fishery. *Fishing Vessel*, 443 U.S. at 674, 685. Having done so, the Court in no way then endorsed the application of equity to detract from the Tribes' treaty-protected allocation.

17

To the contrary, the Supreme Court, and the Ninth Circuit and the district court before it, rejected arguments, made vehemently both inside and outside the courtroom, that tribal rights should yield to the economic and other interests of non-Indians. *See* Charles Wilkinson, TREATY JUSTICE: THE NORTHWEST TRIBES, THE BOLDT DECISION, AND THE RECOGNITION OF FISHING RIGHTS chs. 11-12 (2024).

*Fishing Vessel* and the federal court decisions leading up to it point the way for the proper resolution here: adhering to the rule of law and tribal rights rather than undermining them out of deference to (so often overheated) claims regarding private-party interests premised on the neglect of tribal rights that are clear but inconvenient to those who have disregarded them. *See also, e.g.*, *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2482 (2020) ("[M]any of the arguments before us today follow a sadly familiar pattern. Yes, promises were made, but the price of keeping them has become too great, so now we should just cast a blind eye. We reject that thinking. If Congress wishes to withdraw its promises, it must say so.").

18

**B.    The United States Fails To Explain How the District Court Was at Liberty To Substitute Its Conception of the Public Interest for That of Congress.**

The government nowhere addresses the Band's argument that even if the four-factor injunction test applies, Congress has already determined the public interest to require tribal consent to any conveyance of an interest in tribal lands and that the district court accordingly could not substitute its own conception of the public interest by forcing a three-year easement across the Band's land. Band.Opening.Br.78-79; Band.Reply.22-24. The United States argues extensively that the district court should re-weigh considerations that it contends go to the public interest without ever explaining why the court should not instead honor Congress's determination regarding the same.

The United States has again taken the same position as the Band in other litigation. For instance, in a closely watched Fifth Circuit case involving Texas's placement of buoys in the Rio Grande to stop illegal border crossings, the government just last month argued that "federal courts' equitable discretion cannot 'override Congress' policy choice, articulated in

19

a statute, as to what behavior should be prohibited.'" Supplemental En Banc Brief for Appellee at 47, *United States v. Abbott*, No. 1:23-cv-00853 (5th Cir. Mar. 18, 2024), Dkt. 195-1 ("*Abbott* Br.") (quoting *Oakland Cannabis*, 532 U.S. at 497). The government contends there that the prohibition in the River and Harbors Act, 33 U.S.C. § 403, on erecting obstructions in navigable waterways absent Congress's assent is dispositive: "Congress has already decided that the public interest weighs so heavily in favor of an injunction as to be determinative[.]"*Abbott* Br. 47. The prohibitions in the Non-Intercourse and Right-of-Way Acts against conveyances of interests in tribal lands absent tribal and congressional assent are equally clear and worthy of judicial respect.[2]

---

[2] Similarly, in *United States v. Osage Wind, LLC*, No. 4:14-cv-00704-JCG-JFJ, 2023 WL 8813867 (N.D. Okla. Dec. 20, 2023), the government successfully argued that an injunction was required against an infrastructure company's trespass on the Osage Nation's mineral estate, again for reasons mirroring those advanced by the Band here:

> Congress has enacted law … to preserve the [Osage Mineral Estate] and to allow alienation in a specific manner. When considering public interest as part of an equitable balancing test, the Tenth Circuit has confirmed that "democratically elected representatives … are in a better position than this

The Transit Treaty, 28 U.S.T. 7449, does not alter this conclusion. The United States recognizes that "the Band's sovereign land rights …. stem from the Band's treaty with the United States and include a 'treaty right of occupancy' on the Reservation 'with all its beneficial incidents,' including the 'power to exclude' others from the Band's lands." U.S.Br.31 (citing Treaty with the Chippewa arts. 2, 11, Sept. 30, 1854, 10 Stat. 1109; *Merrion*). It does not dispute that "Congress alone may diminish" rights guaranteed by the 1854 Treaty, *Lac Courte Oreilles*, 46 F.4th at 571. Nor does it dispute that Congress "must clearly express its intent to do so," which requires "clear evidence that Congress actually considered the conflict between its intended action … and Indian treaty rights … and chose to resolve that conflict by abrogating the [Indian] treaty," *Herrera v. Wyoming*, 139 S. Ct. 1686, 1698 (2019) (citations omitted).

---

Court to determine the public interest…." *Fish v. Kobach*, 840 F.3d 710, 755 (10th Cir. 2016).

United States' Motion for Summary Judgment at 24, Dkt. 300. The district court agreed. *See* 2023 WL 8813867, at *17.

The Transit Treaty does not remotely meet this standard. No indication exists in the Treaty text or history that Congress (or the Executive Branch) intended the Treaty to diminish preexisting tribal rights. This is fatal to the government's argument that the Transit Treaty provides any authority for the district court to suspend or deny enforcement of the Band's treaty right to exclude. Courts may not accomplish indirectly through equity what the law prevents them from accomplishing directly. *See Matter of Greenig*, 152 F.3d 631, 635 (7th Cir. 1998) (a court "cannot use its equitable power to circumvent the law" (citation omitted)); *see also United States v. Choctaw Nation*, 179 U.S. 494, 533 (1900) (courts "are not at liberty to dispense with any of the conditions or requirements of [a] treaty … upon any notion of equity or general convenience").

*Fishing Vessel* is again instructive. The State argued that a U.S.-Canada treaty dividing Fraser River salmon equally between the two countries preempted the tribal treaty right to take fish from that river. 443 U.S. at 689. The Court flatly rejected this argument due to the lack of "explicit statutory

language" in the U.S.-Canada treaty indicating congressional intent to abrogate tribal treaty rights. *Id.* at 690.

The authority to "lessen," "diminish," "modify or even abrogate" tribal sovereign rights belongs to "*only* Congress." *Lac Courte Oreilles*, 46 F.4th at 557, 571. Congress has not sanctioned—be it through the Transit Treaty or otherwise—the United States' suggestion that the district court can lessen or diminish the Band's right to exclude by allowing Enbridge to engage in further trespass on its lands. "To the extent that a district court's discretionary determination is based on a factor that is improper, … it [would] necessarily [be] an abuse of discretion." *Johnson v. Cherry*, 256 F. App'x 1, 4 (7th Cir. 2007); *see also, e.g.*, *United States v. Blitch*, 622 F.3d 658, 667 (7th Cir. 2010) ("[A]n abuse of discretion occurs when an … improper factor is considered and given significant weight[.]").

Congress has clearly provided that the public interest lies in the vindication of the Band's treaty right to exclude and in preventing the unconsented use of the Band's lands. No role exists for the equitable diminishment of those rights.

23

## III.    This Court Should Reject the United States' Suggestion for an Open-Ended Remand.

Even if the district court enjoyed discretion to undertake its own public-interest analysis, it did not abuse that discretion in imposing a fixed end date on Enbridge's decade-plus trespass. While a proper assessment of the factors considered by the district court called for a much tighter date, *see* Band.Opening.Br.77-81; Band.Reply.25-29; *infra* pp. 27-30, there exists no warrant for the United States' suggestion that the present end-date of June 16, 2026, should be vacated (absent a shorter timeline being substituted in its place) and the case remanded for further, open-ended consideration of largely amorphous factors.

A remand would be neither neutral nor innocuous. As a practical matter, the additional delay invited by the government would all but guarantee that Enbridge will perpetuate its ongoing trespass beyond June 2026. The district court has a heavy docket, and a remand (which, as framed by the United States, would almost certainly require a further hearing) followed by renewed proceedings in this Court and then, at the very least, the certiorari process in the Supreme Court would make it

24

difficult to conclude this litigation in keeping with a shutdown date that is now a little over two years away.

A number of the issues advanced by the United States as subjects for a remand have already been considered by the district court. These include: (1) the related subjects of Canada's interests and the economic effects of a shutdown; (2) reroute timing; and (3) the Band's sovereign rights. The other issues broached by the United States (the possibility that it may have to pay damages to Canada under the Transit Treaty and the diplomatic implications of a shutdown) are, as the district court rightly suggested, too speculative to be susceptible to judicial ascertainment and cannot justify prolonging Enbridge's trespass in any event. The Band has already endured close to eleven years of trespass. None of the considerations broached by the United States warrant a remand that would inevitably subject the Band to more.

> **A.    The District Court Has Already Taken into Account Many of the Considerations the United States Advances as Subjects for Remand.**
>
> > **1.    Canada's Interests and the Economic Effects of a Line 5 Shutdown**

25

The government's briefing speaks of Canada's interests and the economic effects of a Line 5 shutdown as two different subjects for district court consideration. The government is double counting. Canada did not weigh in with the district court. It instead relied on Enbridge, which filed the same 2022 statement from Foreign Affairs Minister Joly that Canada has filed with this Court. *See* R357-2; *see also* Canada.Amicus.Br.Att.A. That statement focuses *entirely* on the "economic and energy disruption" that Canada claims will result from a shutdown. R357-2 at PDF p. 2.

The district court rightly understood that it was being asked to consider "Canada's concerns about the economic impact of an immediate shutdown." A43. And any suggestion that the court did not devote considerable attention to that impact, be it on the Canadian or American side of the border, is fanciful.

In its summary judgment ruling, the court identified the resolution of the parties' competing views about the economic consequences of a shutdown as a key remaining issue in the litigation. It then considered testimony from seven experts about those consequences, with expert

reports totaling over 500 pages and with the court itself questioning the witnesses. *See, e.g.*, R603 at 82; R610 at 116; R611 at 87-89. The court also received nine declarations from market participants about the impacts of a shutdown, as well as six amicus briefs focused on those impacts. Ultimately, the court issued an opinion including six pages of discussion about market impacts in the United States and Canada, A94-99, and concluding that a three-year shutdown period would "give the public and other affected market players time to adjust to a permanent closure of Line 5," A123. The court's attention to these issues is a far cry from the cases cited by the United States in which district courts were faulted for inadequate attention to the public interest. U.S.Br.32. In *N. Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1157 (9th Cir. 1988), there was no reference to the public interest at all. In *Aid for Women v. Foulston*, 441 F.3d 1101, 1121 (10th Cir. 2006), there was but one sentence of analysis.

Nor did the district court abuse its discretion by declining to allow more than three years for market adjustment. While the Band maintains that the district court's market analysis contains significant errors, every one of

27

those errors runs in the direction of *overstating* the time needed for an adjustment. Band.Opening.Br.80-81; Band.Reply.26-29; Amicus Br. of Great Lakes Business Network ("GLBN.Amicus.Br.") 7-14.

The district court heard testimony—including from Enbridge's own expert—that even an immediate shutdown would affect gasoline prices by less than a penny in Wisconsin and Michigan and a nickel in Ontario, and that existing infrastructure would allow the refineries to replace nearly all their Line 5 crude oil within months (and every drop if given 12-18 months). *See* GLBN.Amicus.Br.7-11 (recounting record evidence). After several days of expert testimony, the district court remarked that the Band "did an effective job of laying out why, at least with respect to crude oil"—which constitutes over 80% of Line 5's throughput—"there are alternatives to get the product to an appropriate refinery." R605 at 19:20-22. Enbridge's expert agreed that there are "greater options" for replacing crude oil and that "propane"—derived from the natural gas liquids also transported by Line 5—"is the key concern." R610 at 113-114.

28

For propane, the court heard ample testimony that the market can adjust in far less than three years. *See* GLBN.Amicus.Br.11-14 (recounting record evidence). This includes evidence that when a different pipeline serving the Midwest—carrying about the same volume of propane as produced from Line 5 natural gas liquids—was reversed in 2014 with less than two years' advance notice, the market readily adapted with no discernible impact on consumer prices. *See id.* at 13. Indeed, the State of Michigan has carefully studied the issue and has concluded that six months would be sufficient for a propane supply transition. Michigan.Amicus.Br.21-23.

The only conclusion to be drawn from the considerable record evidence, then, is that three years is far *more* than necessary to let the market prepare for a shutdown. Enbridge has not identified a single market adjustment that would take close to that amount of time, relying instead on exaggerated claims about the impact of an *immediate* shutdown and blatantly incorrect assertions by amici, *see* GLBN.Amicus.Br.14-17 (debunking Enbridge amici). Enbridge principally argues that *no* amount of time will allow the market to adapt because market actors will be

paralyzed if they believe a reroute might be completed soon thereafter. Enbridge.Opening.Br.46. If anything, that argument favors an earlier fixed end date to allow the market to recoup its investments regardless of reroute completion—or it simply amounts to an argument for indefinite trespass, *see* Band.Opening.Br.82, which the district court rejected as flatly inconsistent with the Band's rights, A122-23, A126. The paralysis argument, moreover, is belied by the fact that the market has *already* made adjustments in response to the Band's and Michigan's lawsuits. *See* GLBN.Amicus.Br.18-20; Michigan.Amicus.Br.21-22.

In sum, market impacts—and Canada's concerns about those impacts—provide no support for the government's suggestion for an open-ended do-over on remand.

### 2. Reroute Timing

As the United States indicates, in its summary judgment order the district court contemplated a remedy predicated on Enbridge completing a reroute within five years and directed party input on Enbridge's likelihood of such completion. U.S.Br.25 (citing A43). Following testimony and

exhibits admitted at trial, the district court became highly skeptical that a reroute could be finished within five years, if ever. "[T]here are significant reasons to question when, and even if, a reroute will ever be operational in this case." A126; *see also* A123; Clean.Wis.Amicus.Br.29-33 (discussing record evidence on reroute timing).

The government does not challenge the district court's finding, and its lengthy footnote recounting the current permitting status confirms that nothing has changed in the year and a half since trial. *See* U.S.Br.38.n.8; A64 n.5, A94. Five years after Enbridge submitted applications plagued with infirmities[3]—which it only did years after recognizing and admitting that it was illegally trespassing—Enbridge has secured none of the myriad permits and other authorizations it needs. *See id.*; A94.

It is not even close to doing so. Federal agencies have grave concerns about the impacts of Enbridge's proposed reroute on the Bad River watershed and Lake Superior, concerns shared by countless regional

---

[3] Trial.Ex.350 at PDF pp. 5-6 (four requests by WDNR for additional information); Trial.Ex.356 (April 2022 EPA letter stating Enbridge had not provided sufficient information to evaluate environmental impacts).

stakeholders. A94; Clean.Wis.Amicus.Br.30-31. Assuming the Corps of Engineers actually publishes a draft combined decision document for public comment this spring, that will undoubtedly prompt extensive comment and the need for substantial additional information. U.S.Br.38.n.8 (explaining that the Wisconsin Department of Natural Resources received 32,000 comments in response to its draft document pertaining to state permitting and that Enbridge has been required to submit supplemental information). Moreover, the United States does not mention key, lengthy processes that the Corps' actions will then trigger, such as the Clean Water Act Section 401(a)(2) downstream jurisdiction certification process, 33 U.S.C. § 1341(a)(2). *See also* Clean.Wis.Amicus.Br.30-33 (explaining environmental concerns and regulatory obstacles to obtaining approval). And no matter the outcome of the many state and federal permit processes, given the broad opposition to the reroute from entities, organizations, and individuals extending far beyond the Band, it is inevitable that time-consuming litigation will then follow.

The government itself does not exude confidence that Enbridge will obtain its permits. *See* U.S.Br.38.n.8 (indicating Enbridge may be required "to consider modifications to the project or propose alternative projects to comply with applicable laws"). It even suggests that on remand, the district court could use its equitable powers to force Enbridge to "submit possible alternatives to Enbridge's current proposal that are consistent with the public interest and that might result in quicker termination of Enbridge's trespass[.]" *Id.* at 39. But assuming the district court could act as Reroute Czar and would require Enbridge "to take specific actions needed to reroute the pipeline by specific dates," *id.* at 38, such as designing an alternative reroute by a date certain (itself a lengthy endeavor), this would only serve to restart the years-long agency review processes, the result of which would itself be uncertain. And the United States presumably is not suggesting that the district court could control the timing or outcome of the multiple agency processes as an incident of its equitable authority. *See Md. Dep't of Human Res. v. U.S. Dep't of Agric.*, 976 F.2d 1462, 1480 (4th Cir. 1992)

("An injunction may not strip a federal agency of its power to exercise lawful authority conferred by Congress through statute.").

In the end, the United States' briefing only confirms the district court's conclusion that a trespass injunction tied to completion of the reroute would amount to an "indefinite" delay, A123.

### 3.    The Band's Sovereign Rights

The United States contends that the district court failed to "fully consider the ongoing harm to the Band's sovereignty, treaty rights, and property rights from allowing Enbridge's trespass," arguing that although the court "acknowledged the Band's sovereign interests to some extent" in its summary judgment order, "it did not specifically consider those interests in crafting the permanent injunction" in its final order. U.S.Br.31-32 (citing A40-42; A121-123).

The Band of course appreciates the United States' recognition that it has important sovereign interests at stake in this litigation. But both the premise of the United States' argument, and the conclusion it draws, are incorrect.

34

The district court specifically "conclude[d] that the Band is ultimately entitled to permanent injunctive relief on its trespass claim under a fair reading of the current law applicable to its sovereign rights.… Enbridge [has not] cited any legal authority suggesting that the court could effectively force a renewal of expired easements despite the Band's sovereignty[.]" A122; *see also* A21-22 (describing treaty and statutes protecting Band's sovereign rights); A126 ("[T]he court declines to permit an indefinite, intentional trespass on the Band's sovereign territory.").

It is unfair to the district court, then, to suggest that it did not take the Band's sovereign interests into account in fashioning its remedial order. The problem with the court's decision is its failure to recognize that those interests—and Congress's protections of them—require a prompt cessation of Enbridge's trespass. *Supra* pp. 12-23. But rather than urging that conclusion, the United States argues for a remand that would all but guarantee further delay in vindicating the Band's rights. If that is the result the United States views as appropriate, it should be petitioning Congress— the only entity empowered to deliver it—not the courts.

35

**B.    The Additional Considerations Advanced by the United States Provide No Basis for a Remand.**

The government faults the district court for failing to consider the United States' obligations under the Transit Treaty, especially its interests "in avoiding potential monetary liability if it is found to have breached its obligations" and diplomatic friction with Canada. U.S.Br.30. These issues provide no occasion for a remand.

To begin, the United States never raised them with the district court, even though it had a statutory right to do so, 28 U.S.C. § 517, and Canada had invoked dispute resolution under the Transit Treaty prior to trial, R357-2. The government did not even raise them with this Court until invited and then urged to file a brief. The district court can hardly be blamed for not taking into account considerations first raised by the United States almost eighteen months after trial. The government, moreover, provides no basis to conclude that these considerations could or should have altered the district court's analysis.

### 1.    Transit Treaty Liability

The government steadfastly refuses to supply this Court with an explicit interpretation of the Transit Treaty, but plainly agrees with the Band that the Treaty does not deprive courts of the authority to enjoin a transit pipeline trespass. The government contemplates that one potential outcome of its proposed remand would be just such an injunction by the district court, U.S.Br.36-37.&.n.7, whereas Enbridge and Canada argue that Article II of the treaty precludes such relief, Enbridge.Opening.Br.33-35; Canada.Amicus.Br.11-14.

The government's view that the district court may enjoin a trespassing pipeline comports fully with the Band's interpretation of Article IV of the Treaty, Band.Opening.Br.84-90; *see also* Michigan.Amicus.Br.16-18, which allows for "appropriate governmental authorities having jurisdiction over such Transit Pipeline[s]" to subject them to "regulations" by such authorities, so long as they are "applied equally to all persons and in the same manner," art. IV, 28 U.S.T. 7449.

The term "regulations" plainly encompasses the Band's Resolution requiring Enbridge to honor the terms of its easements as well as the district court's order enforcing those terms. *See, e.g.*, *Regulation*, Black's Law Dictionary (11th ed. 2019) ("An official rule or order, having legal force, usu. issued by an administrative agency"); *see also* art. IV(2), 28 U.S.T. 7449 (referring to "regulations, requirements, terms and conditions imposed under paragraph 1"). But even if the term is understood more narrowly to refer only to agency rules, such rules are precisely the basis the United States identifies for Enbridge's trespass liability and hence for a potential injunction: "Enbridge must follow the requirements of the Indian Right-of-Way Act and implementing regulations to obtain a legal right to keep its pipeline on the Band's land—it must secure a right-of-way from Interior." U.S.Br.12. Given that no argument has been made that the district court or the Band is *discriminatorily* enforcing the Band's rights here because Line 5 is a Canadian Transit Pipeline, the district court's trespass injunction falls squarely within Article IV.

There is, of course, no way to guarantee that an arbitral panel would see things this way. But that simply underscores another infirmity with the government's position. This Court has consistently counseled that speculative considerations should not inform the exercise of equitable authority, *see, e.g.*, *Halczenko v. Ascension Health*, 37 F.4th 1321,1324-25 (7th Cir. 2022); *Winkler v. Eli Lilly*, 101 F.3d 1196, 1204 (7th Cir. 1996), and the Ninth Circuit has made the point specifically with respect to the public interest prong of the injunction test:

> [T]he district court need not consider public consequences that are highly speculative. In other words, the court should weigh the public interest in light of the *likely* consequences of the injunction. Such consequences must not be too remote, insubstantial, or speculative and must be supported by evidence.

*Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009) (quotation marks and citation omitted).

Here, by contrast, the government would have the district court *embrace* speculation by considering (among other factors) whether, in the event of a shutdown, Canada would actually press arbitration; how the panel would view the merits and, if it sided with Canada despite Article IV, whether

39

Canada could even state a viable claim for damages (which would be difficult if the markets adapt); and how the panel would assess that claim. The district court can again hardly be faulted for not venturing down this uncertain path, and this Court should not require it to, especially with the government apparently unwilling to offer guidance along the way.

And even if there exists some (remote) prospect that an arbitral panel would ultimately impose a binding damages award, the government nowhere explains how or why that should weigh against vindication of the Band's rights here. As detailed above, Congress has clearly prohibited the unconsented use of tribal lands. And Congress nowhere evidenced an intent in the Transit Treaty to back away from that commitment. *If* the United States made a promise to Canada that is inconsistent with the Band's sovereign rights, the answer is not to deny enforcement of the latter—the United States cites no authority for such a radical proposition, and none exists.

40

### 2. Diplomatic Relations with Canada

All this applies equally to the government's argument that the district court should consider the effects of a shutdown on U.S.-Canada relations. When Enbridge broached the issue, the district court rightly stated this is "not a factor I can confidently consider." R605 at 47:2-3. Under the United States' approach, the district court would again have to embrace speculation: What would the state of the U.S.-Canada relationship be at that point? Is it plausible that a Line 5 shutdown would be more than a minor irritant to Canada? Given that Canada has received significant international disapprobation for its approach to the Line 5 issue, and more generally for its treatment of its First Nations, *see* Amicus Br. of Human Rights and Envtl. Orgs., would it in fact choose to make an issue out of the United States' compliance with its treaty-based obligations to the Band and other tribes?

And if the district court were directed to engage in that degree of speculation, fairness would dictate that, at a minimum, it also weigh: the understandable consternation that numerous tribes watching this case

41

would feel if a decade-plus trespass on tribal lands by a Canadian corporation were extended for even longer; the State of Michigan's view that a shutdown of Line 5 would serve the public interest; and the likelihood that Michigan's ongoing lawsuit will result in a shutdown of Line 5, making any friction with Canada from this case incremental.

Such considerations lie beyond the realm of reliable ascertainment. And again, even if one could predict with some certainty that diplomatic friction would ensue from a Line 5 shutdown, the government never explains how that could justify a wholesale abandonment of the Band's rights.

* * *

Congress has made clear that tribal consent is required for the use of tribal lands, period. The United States' briefing, amorphous and indeterminate as it is, well evidences the importance of adhering to Congress's will. And at the very least, it utterly fails to establish that the district court abused its discretion in declining to bless a continued, indefinite trespass on the Band's lands based on the ill-defined considerations belatedly raised by the United States.

42

## IV.   The United States Correctly Argues that the District Court Erred in Its Disgorgement Award.

The government properly concludes that the district court abused its discretion by requiring Enbridge to disgorge "a paltry amount" of its profits. U.S.Br.46. Restitution "should ensure that [Enbridge] does not profit from its conduct and deter similar conduct in the future," *id.* at 41, and thus the district court's de minimis $5 million award fails to "meet the goals of restitution" and "sends a troublesome message to others who may want to trespass on Indian lands," *id.* at 46; *see also* Band.Opening.Br.60-72; Band.Reply.3-15; Roberts.Amicus.Br. Yet the United States declines to identify a measure of disgorgement consistent with those goals.

The best way to achieve the core purpose of restitution—to make Enbridge's trespass unprofitable and thereby deter similar trespasses on tribal land—is to require disgorgement of *all* Enbridge's Line 5 profits during the period of trespass. But if this Court will not require full disgorgement, it should at a minimum require disgorgement of the full avoided-cost calculation—plus whatever additional amount of Enbridge's past trespass profits it concludes is consistent with principles of equity and

43

restitution. It should also require Enbridge to disgorge all its Line 5 profits for any period of continued trespass, as that amount is compelled not only by principles of restitution but also the public interest. Anything short of that will reward Enbridge handsomely for its ongoing trespass on sovereign lands.

### A. Core Principles of Restitution and Federal Law Strongly Favor Disgorgement of All Profit Enbridge Has Earned from Line 5 While Trespassing.

1. From June 2013 to June 2022—the first nine years of its conscious trespass—Enbridge earned over $1.1 billion in nominal Line 5 profit. A117-118. Converted to present value (using the district court's conversion rate), that is over $1.6 billion.[4] Enbridge earns about $150 million for each additional year of trespass, *see* A118 (2021 profit of $154 million), so its trespass profits will soon exceed $1.9 billion.

---

[4] Specifically, $1,628,989,522. This figure is the $1,119,042,057 in nominal profits, *see* A117-118, increased by 45.57%, which matches the district court's conversion of $3,030,075 in prorated nominal profits into $4,410,969 in present-day value using Enbridge's time value of money, *see* A118-119.

The United States confirms that Enbridge has no cognizable interest in those profits, as it agrees with the district court that a delayed injunction is potentially justifiable in this "extraordinary case" only because of the *public* interest, U.S.Br.35-36. Given that Enbridge has not completed a reroute, its sole alternative to trespass has been to shut down Line 5—and thus forgo all its Line 5 profits, *see* Enbridge.Opening.Br.23 ("[A] pipeline has value only if it can operate across its entire length. Remove a single segment, and the entire pipeline is rendered worthless.").

2. Indeed, as the government explains, the normal consequence of easements expiring on tribal land is an "immediate" shutdown regardless of the impact on company profits. U.S.Br.35 (citing *Osage Wind*, 2023 WL 8813867). For example, when Tesoro continued operating a crude-oil pipeline through the Fort Berthold Indian Reservation after its easements on allotted parcels expired, the Trump Administration ordered it to stop, and the company complied. *See* United States' Answer and Counterclaim at 27, *Tesoro High Plains Pipeline Co. v. United States*, No. 1:21-cv-90 (D.N.D. Feb. 8, 2022), Dkt. 28 (suing for removal of now-idle pipeline and stating

company complied with 2020 shutdown order). Elsewhere, the Swinomish tribe sued BNSF Railway for trespassing by sending more oil (by rail) across its reservation than permitted by BNSF's easement, and the company stopped trespassing before the court even addressed injunctive relief. *See Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, No. C15-0543RSL, 2022 WL 3597439, at *6 (W.D. Wash. Aug. 23, 2022).

Other companies respect tribal rights—and thus forgo substantial profit—without waiting to be sued. For example, when the Yellowstone Pipeline Company's easement on the Flathead Reservation expired in 1995 (which the tribe declined to renew due to environmental concerns), the company ceased pumping oil through the reservation.[5] Restitution is designed to make such law-abiding behavior *more* appealing, not signal that such companies are fools for respecting tribal rights without waiting

---

[5] *See Tribes Order Company To Remove Its Pipeline [After] Talks on New Lease of Corridor Across Reservation Break Down*, The Spokesman-Review (Nov. 3, 1995), https://www.spokesman.com/stories/1995/nov/03/tribes-order-company-to-remove-its-pipeline-talks/.

for a court order, which is indeed "a troublesome message to others who may want to trespass on Indian lands," U.S.Br.46.

3. The United States is correct that in some cases, "something less than full disgorgement" may be equitable. U.S.Br.44 (citing *Kansas v. Nebraska*, 574 U.S. 445, 465 (2015)). But *Kansas* underscores that equitable considerations do not help Enbridge. Nebraska had not engaged in any wrongdoing for nearly a decade and had implemented policies to ensure it would never do so again. 574 U.S. at 465. Here, Enbridge has spent the past decade consciously trespassing on the Band's sovereign land and continues to do so. *Supra* p. 12.

Because Enbridge's reroute is not close to completion, the way to return Enbridge to the same position it would have been in without trespassing is to require disgorgement of all its Line 5 profits since June 2013. Only that amount will fully "eliminate profit from wrongdoing" and thus achieve the core objective of restitution. U.S.Br.44 (quoting Restatement (Third) of Restitution and Unjust Enrichment ("Restatement") § 51(4)). That $1.9 billion is a large sum is no defense against a proper restitution award. *Cf.*

47

*Liu v. Secs. & Exch. Comm'n*, 591 U.S. 71, 79 (2020) (explaining that restitution is impermissibly "punitive" only if it exceeds the "wrongdoer's net profits"); Restatement § 51 cmt. k. The profitability of wrongdoing is precisely why restitution is needed to deter it in the first place.

4. As the government acknowledges, state common-law principles "are not incorporated into federal common law unless they are consistent with federal law and would not 'frustrate specific objectives of the federal programs.'" U.S.Br.19 (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98 (1991)). Hence, while a few state-law cases involving one-time trespasses on private land have allowed for partial disgorgement, those cases cannot justify partial—let alone paltry—disgorgement for a *continuous, conscious* trespass on land *protected categorically from non-consensual use by multiple federal statutes*. Less-than-full disgorgement of Enbridge's Line 5 profits would undermine the Non-Intercourse Act, the Right-of-Way Act, and the 1854 Treaty with the Chippewa by making violation of those laws profitable and should not be countenanced here. *See* Band.Opening.Br.61-62; Band.Reply.7-8.

48

## B. Disgorgement of Less than the Avoided-Cost Calculation Would Violate Core Principles of Restitution and Fundamentally Undermine Federal Law.

1. As the district court found, Enbridge benefited to the tune of $296 million by deferring the $500 million reroute expense for over a decade. A121. Because Enbridge's savings are entirely attributable to its continued trespass, it makes no sense to prorate them by the length of the pipeline. *See* Band.Opening.Br.70-71. The government agrees and correctly explains that the district court's decision to discount this avoided-cost measure based on the full length of Line 5 "does not meet the goals of disgorgement" because "it encourages a trespasser to delay relocation" and "permits Enbridge to profit handsomely from its trespass." U.S.Br.45-46.[6]

---

[6] The $296 million—which accounts for construction-sector inflation—is the most conservative possible calculation of Enbridge's avoided costs, because it assumes completion of Enbridge's preferred "inner" reroute by 2026 (even though this reroute will not be built by 2026 and the value of a longer delay will be greater). *See* R583 at PDF pp. 5, 22-27. If the reroute proves nonviable, that will mean that only a shutdown—or theoretically a more expensive reroute—would have been Enbridge's least-expensive alternative to trespass, in which case the gain derived from trespassing is undoubtedly *more* than this calculation.

2. The United States goes badly astray, however, by offhandedly suggesting that the district court might not have erred had it discounted the avoided-cost calculation *differently*, based on "the percentage of the pipeline length crossing the 12 parcels on which Enbridge is in trespass[.]" U.S.Br.44. That is, the government seemingly suggests it could be acceptable to require disgorgement of 2.33/12ths—2.33 miles of trespass out of 12 miles of pipeline crossing the reservation—of the $296 million calculation. That is badly mistaken.

*All* of Enbridge's reroute savings are attributable to Enbridge's trespass on the Band's land. Given the broad dispersal of the trespass parcels within the pipeline corridor, *see* Band.Opening.Br.19 (map), and tribal land's immunity from condemnation, there is no possible legal way for Enbridge to reroute around less than "the entire Reservation to terminate Enbridge's conscious and willful trespass[.]" U.S.Br.43. Enbridge has not disputed that this reroute represents its least-expensive option.

The United States cites no precedent for prorating an avoided-cost calculation, and doing so here would be irrational. It would leave Enbridge

far better off than had it timely achieved the least-expensive conceivable alternative. That would utterly "fail[] to 'eliminate [Enbridge's] profit from wrongdoing'," U.S.Br.44 (quoting Restatement § 51(4)), and would make a mockery of the federal laws protecting the Band's sovereignty by incentivizing trespasses on Indian land.[7]

3. Although the United States is correct that "equitable factors" can sometimes justify less than *full* disgorgement, U.S.Br.45.n.9; *see also supra* pp. 46-47, it does not specify any such factors here—and none exist that would justify reducing disgorgement below the full avoided-cost calculation.

---

[7] The Band does not contest discounting based on the Band's ownership share in the trespass parcels. *See* Band.Opening.Br.63.n.9. Under such discounting, the $296,234,750 avoided-cost calculation is $205,749,845. *See* A121; R583 at PDF p. 71. Principles of restitution did not call for this discounting (and, indeed, such discounting makes little sense given that only the *Band's* interest in the parcels makes them immune from condemnation). *See* Roberts.Amicus.Br.18. Rather, the Band made this concession in opposing Enbridge's motion to require joinder of all fractional co-tenants of the trespass parcels as plaintiffs, *see* R80 at 12, which would have dramatically prolonged the case and delayed the Band's ability to end Enbridge's unlawful occupation of its sovereign land.

The "equitable factor" that Enbridge has pointed to is that it has been earnestly trying to reroute in recent years. Enbridge.Reply.29. But that ignores a basic principle affirmed by the United States: it is *Enbridge*, not the Band, that has a legal obligation to end the trespass, *see* U.S.Br.38.[8] The avoided-cost calculation represents the minimum amount necessary to put Enbridge *on par with* where it would be had it fulfilled that legal obligation in the *least-expensive way imaginable*. Thus, even if Enbridge had been trying earnestly to complete a reroute since before 2013, there would be nothing equitable about turning each year of trespassing-while-failing-to-reroute (and thus not spending $500 million) into an affirmative boon for Enbridge. It is generous enough to measure Enbridge's wrongful gain based on the delay of a still-hypothetical alternative, rather than the full trespass profits

---

[8] In contrast, the Band owes Enbridge no duty to enable its preferred alternative. The Band's sovereign rights are not contingent on facilitating a reroute that it has concluded would endanger the natural resources on which its way of life depends. *See also* Clean.Wis.Amicus.Br.29-33 (detailing federal agencies' and other stakeholders' concerns about environmental impacts of proposed reroute).

worth six times as much (none of which it would have earned had it respected the law by shutting down its pipeline on Day 0 of the trespass).

Moreover, even if diligent pursuit of a reroute could justify discounting the avoided-cost calculation, Enbridge's reroute efforts are far from commendable. Enbridge knew well in advance that its easements would expire in 2013, and it has been consciously trespassing since then. U.S.Br.6. By 2015, employees within Enbridge were warning that the company needed to reroute the pipeline around the Reservation to avoid shutting it down. *See* Trial.Ex.334. In 2017, one regional executive expressed frustration—"Banging head against wall… I'm still unclear how this is new info"—in response to an email advising him yet again that the company should be pursuing a reroute and that "a federal/tribal judge could order the pipeline shut down immediately (and to be removed within 6 months) if Bad River seeks a court remedy." Trial.Ex.369. Yet unlike other

companies, Enbridge did not shut down in accordance with its legal obligations or even try to reroute for the first seven years of trespass.[9]

Even after the company finally submitted (incomplete) permit applications for the inner reroute in 2020, executives privately expressed hope that their legal team could push out the trial date to allow Enbridge to further defer spending on the reroute, and they asked staff to "*assess[] cost savings benefits possible through delay scenarios*," Trial.Ex.376 (emphasis added).

These facts favor requiring Enbridge to disgorge much *more* than a sixth of its nearly $1.9 billion in trespass profits instead of so generously measuring Enbridge's ill-gotten gains based on its preferred, still-hypothetical alternative to trespass. At a *minimum*, though, disgorgement must be at least equal to the full avoided-cost calculation. Equity cannot

---

[9] Enbridge's contention that entering mediation from 2017 to 2019 was somehow an equitable factor excusing its trespass, Enbridge.Reply.29, betrays the parties' mediation agreement, which expressly did not "affect[] the status of any expired or unexpired Enbridge Right-of-Way or any rights, duties, obligations, or performance of Enbridge" and did not "in any way supersede, limit or otherwise affect" the Band's request that Enbridge immediately leave the Reservation.

countenance a company trespassing on sovereign tribal land for over seven years before even submitting applications for an alternative, strategizing about obtaining further delays to save money, failing to obtain regulatory approval even eleven years into the trespass, and then being left financially *better* off than had it timely avoided its trespass in the least-expensive legal way imaginable.

4. As for any suggestion that this would amount to a "windfall" to the Band, the United States is correct that "it is more appropriate to give the [plaintiff] the benefit even of windfalls than to let the [wrongdoer] keep them." *See* U.S.Br.45.n.9 (quotation marks omitted). But to be clear, a proper restitution award would not be a windfall. The Band has endured over a decade of Enbridge interfering with its governance and politics, straining the resources of its regulatory agencies, thumbing its nose at the Band's sovereignty, and courting environmental catastrophe. The Band's refusal to settle this case illustrates how severe those burdens are. For years, the Band has held an immense bargaining chip: extending Enbridge's easement would render unnecessary a $500 million reroute. But

the Band has never entertained such a resolution because of its deep concerns for its sovereignty, its watershed, and its way of life—which speaks volumes about any supposed windfall. The Band would have preferred that Enbridge had spared it and the courts this litigation by respecting its rights.

### C. For Any Period of Continued Trespass, Enbridge Should Be Required To Disgorge All Its Profits.

Even if Enbridge is required to disgorge less than its full profits from its past trespass, it should be required to disgorge all its Line 5 profits from any continued trespass. According to the United States (and the district court), the only justification for Enbridge's continuing trespass across the Band's lands is the "public interest," U.S.Br.35-36, yet Enbridge itself is profiting immensely by it. Reducing the continuing profitability of Line 5 would serve the public interest, not least because it would incentivize Enbridge to fully deploy Line 78, which serves the same refineries and has unused capacity that could be further increased simply by adding pumps. *See* GLBN.Amicus.Br.8. That one adjustment would increase the market area's oil-transporting infrastructure enough to offset *every drop* of Line 5

56

oil. *See id*. Accordingly, disgorgement substantial enough to spur Enbridge to take that step would have the dual benefits of reducing the volume of crude oil on Line 5 (and thus the magnitude of a possible spill) and enhancing the market's already robust ability to absorb a shutdown.

## V.    The United States Misapplies the Law of Displacement.

Almost five years into this case, and only after painstaking litigation yielded a court-ordered shutdown and purge plan that provides at least some measure of protection for the Bad River watershed and Lake Superior, the government argues for the first time that those efforts were for naught because the Band's public nuisance claim is displaced. Its eleventh-hour claim misapprehends the controlling test for displacement, ignores key provisions of the Pipeline Safety Act (PSA), and puts fragile resources at even greater risk.

"The test for whether congressional legislation excludes the declaration of federal common law is simply whether the statute speaks directly to the question at issue." *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 424 (2011) ("*AEP*") (quotation marks and brackets omitted). The government's

argument fails that test. It hinges on the PSA's directive to the Department to "prescribe minimum safety standards for pipeline transportation and for pipeline facilities," 49 U.S.C. § 60102(a)(2). But the government never establishes that the term "safety standards" (which the PSA does not define) encompasses questions about the permissible distance between pipelines and migrating rivers. And that issue is inherently not susceptible to uniform standards. Every river and floodplain differs. Depending on factors including soil type, gradient, and characteristic flow, some rivers may hardly migrate over time, while others, including the reach of the Bad River at issue here, migrate considerable distances within a single season. The permissible location of a pipeline in relation to a river is accordingly highly case-specific and not amenable to fixed standards.

Beyond the safety standard provision, the government points only to general provisions in the PSA authorizing the Department to regulate pipeline and environmental safety. U.S.Br.48-49, 54. But this Court has squarely rejected the argument "that all Congress must do to displace federal law is to indicate its intention to delegate a particular problem to an

executive agency." *Michigan*, 667 F.3d at 777. It has required a greater "level of congressional action," holding that laws "touch[ing] on the issue at hand [are] not enough[.]" *Id.* at 778. Congress must instead "ha[ve] occupied the field to the exclusion of federal common law," *id.* at 777, and the PSA is bereft of any indication that it has done so with respect to river migration and scour issues.

Rather, the PSA (in a provision nowhere acknowledged by the government) expressly "does not authorize the Secretary of Transportation to prescribe the location or routing of a pipeline facility," 49 U.S.C. § 60104(e), leaving that to governments with greater knowledge of local conditions. And it is the location of the pipeline in relationship to the Bad River that forms the heart of the Band's claim. Congress cannot be said, then, to have "provided a sufficient legislative solution," *Michigan*, 667 F.3d at 777, to the nuisance identified by the Band.

This case is accordingly a far cry from those in which the Supreme Court has found federal common law to be displaced. In *AEP*, the Clean Air Act tasked the Environmental Protection Agency with regulating "emissions of

59

carbon dioxide from domestic powerplants—the same relief the plaintiffs seek by invoking federal common law. We see no room for a parallel track." 564 U.S. at 425. And in *City of Milwaukee v. Illinois*, 451 U.S. 304 (1981) (*Milwaukee II*), the Court held that because the Clean Water Act required regulatory permits for all effluent discharges from point sources including sewage treatment plants, "there is no basis for a federal court to impose more stringent limitations than those imposed under the regulatory regime[.]" *Id.* at 320.

The Department has not understood Congress to have tasked it with establishing "a comprehensive regulatory program," *Michigan*, 667 F.3d at 777 (quoting *Milwaukee II*, 451 U.S. at 317), for river migration issues that remotely resembles the statutory schemes in *AEP* or *Milwaukee II*. The government points to several Department regulations that, far from occupying the field, are barely germane. 49 C.F.R. § 195.401 requires an operator to "make repairs on its pipeline system," *id.* § 195.401(b), and to "design[] and construct[]" pipelines according to various requirements, *id.* § 195.401(c), but pipeline repair, design, and construction are not at issue

here. The Department's regulations for "high consequence areas" do not speak specifically to river issues at all (high consequence areas include, for example, "high population … urbanized" areas, *id.* § 195.450), and only require operators to assess the condition of their pipelines *every five years*, *id.* § 195.452(j)(3). And perhaps cognizant of Congress's proscription of federal location-based regulation, the Department's bulletins on geologic hazards and river crossings are advisory only, stating in each instance that pipeline operators "should *consider* taking [certain] actions to ensure pipeline safety," 84 Fed. Reg. 18,919-01 (May 2, 2019); 87 Fed. Reg. 33,576-01 (June 2, 2022), or "are *suggested* to take [certain] actions to … ensure public and environmental safety in areas affected by flooding," 84 Fed. Reg. 14,715-01 (Apr. 11, 2019) (emphases added).

Of course, to find displacement, an agency need not have exercised its delegated authority. *Michigan*, 667 F.3d at 777 (citing *AEP*, 564 U.S. at 425-26). But the Department's actions here belie any sense that Congress has occupied the field with respect to local river-crossing issues. And the lack of on-point regulation puts to bed the government's contention that the

61

Band might instead have brought an action under the PSA's private suit provision "if it met the prerequisites to suit," U.S.Br.55 (citing 49 U.S.C. § 60121(a)(1)). There is no relevant PSA regulation whose violation the Band could sue over, which is a prerequisite for suit, 49 U.S.C. § 60121(a)(1). The availability of alternative enforcement mechanisms has been important to displacement holdings, *see, e.g.*, *AEP*, 564 U.S. at 425, and none exists here.

If any cause for doubt remained, the PSA's tort saving clause eliminates it. Band.Opening.Br.93-94. The government has no answer for the plain text of that provision other than to place caveats on it of the sort that Congress used elsewhere in the statute but not here. U.S.Br.56-58. If justification for doing so ever exists, it surely does not here, as the tension the government posits between the saving clause and the PSA's "safety standards" provision evaporates once the government's conclusory assertions that such standards sweep in inherently local regulation of pipeline locational issues are stripped away. The district court correctly noted that other

courts, relying on the saving clause, have allowed tort claims seeking injunctions against pipeline operators. A51 (citing cases).

The United States' displacement argument accordingly finds no support in the PSA or governing case law. And it is not an innocuous argument. Perhaps sensing the grave risk that would result from vacating the district court's shutdown and purge plan, the government suggests that since Enbridge has now adopted the plan as part of its operational procedures, the Department "is prepared to ensure Enbridge's compliance" with it. U.S.Br.59. While the Band would appreciate and welcome the Department's involvement in ensuring safety at the Bad River meander, the government's suggestion further confirms the infirmity of its position that the Band and the district court should have no further role in safeguarding the watershed. The heart of *AEP*'s displacement holding was that "no room for a parallel track" existed between the emissions limitations sought by the plaintiffs and those being set by the EPA under the statute, 564 U.S. at 425—because the two quite predictably could come into conflict. Here, by contrast, ample room exists for the Band's public nuisance action and the

district court's eventual order. Far from conflicting with Department regulations or processes, the United States understands the judicial result to be so beneficial that it is willing to enforce it.

And there should be no mistake. The plan would never have existed but for the Band's lawsuit. While Enbridge suggested to the district court that the Department had approved its shutdown plan, leading the district court to make a finding to that effect, R684 at 38, Enbridge's counsel acknowledged at argument that this was not the case, Oral.Arg.16:20; *see also* Band.Reply.35 (citing Enbridge filing to same effect), and the government makes no claim of prior Department approval.

As the United States acknowledges, "the Band is a sovereign nation with a compelling interest in ensuring the preservation of the environmental resources on which it relies[.]" U.S.Br.58. The Band, its regulators, and its experts have an unparalleled knowledge of the Bad River and its floodplain and have expended thousands of hours studying

64

the meander.[10] The district court has also now developed expertise with

those issues. Even leaving aside the perpetual concerns with the

Department's enforcement capacity, *see* Congressional Research Service,

DOT'S FEDERAL PIPELINE SAFETY PROGRAM: BACKGROUND AND KEY ISSUES FOR

CONGRESS Summary (Mar. 10, 2022) (detailing "persistent shortfalls [in

PHMSA staffing] affecting the agency's ability to inspect pipelines and

revise its regulations"), and its disadvantages in operating from a distance,

excising the Band and the district court from the enforcement of and any

---

[10] The Band has invested so heavily in the development of a shutdown and purge plan because it views such a plan as a better alternative to what have been demonstrated (through the course of technical reviews and water resource evaluations) to be highly risky and environmentally destructive proposals by Enbridge to armor the banks of the meander—proposals designed solely to enable Enbridge's continued trespass. Ending the trespass would be the best means of also ending the public nuisance, but as this Court knows, the Band has thus far been unable to secure such relief.

Judge St. Eve asked whether the Band itself could shore up the banks of the Bad River. But the Bad River meander is inaccessible by road, and even if a sound engineering plan had been developed for bank stabilization that would not lead to downstream destabilization (none has), the Band does not have the resources or expertise to fly the thousands of helicopter flights that would be necessary to implement it.

necessary refinements to the shutdown and purge plan would only serve to

undercut the protection of the Bad River watershed and Lake Superior.

Dated: April 29, 2024

Respectfully Submitted,

Paul D. Clement
Matthew D. Rowen*
James Xi*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

* Supervised by principals of the firm who are members of the Virginia bar

Erick Arnold
BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION
72682 Maple Street
Odanah, WI 54861
(715) 682-7107

s/Riyaz A. Kanji
Riyaz A. Kanji
David A. Giampetroni
Lucy W. Braun
Josh C. Handelsman*
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400

* Supervised by principals of the firm who are members of the Michigan bar

Jane G. Steadman
KANJI & KATZEN, P.L.L.C.
811 1st Avenue, Suite 630
Seattle, WA 98104
(206) 344-8100

Bruce Wallace
HOOPER HATHAWAY PRICE BEUCHE & WALLACE
126 S. Main Street
Ann Arbor, MI 48104
(734) 662-4426

**CERTIFICATE OF WORD VOLUME AND COMPLIANCE WITH TYPEFACE REQUIREMENTS**

1. This brief is 11,994 words, excluding the parts of the brief exempted from the word count by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Palatino Linotype font.

April 29, 2023

<u>s/Riyaz A. Kanji</u>
Riyaz A. Kanji